Fredrick John **HURRELBRINK**,
Appellant,

v.

The **STATE** of Texas, Appellee.

No. 07–99–0376–CR.

Court of Appeals of Texas, Amarillo.

April 4, 2001.

Sara F. Moore, Attorney at Law, Lubbock, for appellant.

William Sowder, Criminal District Atty. (Wade Jackson, Assistant D.A.), Lubbock, for appellee.

Before BOYD, C.J., and QUINN and REAVIS, JJ.

BOYD, Chief Justice.

Appellant Fredrick John Hurrelbrink challenges his conviction of murder and the court-assessed punishment of 99 years confinement in the Institutional Division of the Department of Criminal Justice. In one issue, he alleges that the trial court erred in allowing expert evidence regarding footprint comparison and analysis. Disagreeing that reversal is required, we affirm the judgment of the trial court.

The victim, Curtis Drake, was found dead in his home on July 7, 1991, from stab wounds. He also suffered blunt force wounds from a pipe. The victim had been engaged in a custody dispute with his former wife, Barbara Drake, who was having a sexual relationship with appellant. A small curved knife found at the scene of the crime was identified as similar to one

owned by appellant, and appellant had been heard to say that if Curtis gave Barbara "a hard time or messed with her," appellant would kill him. Appellant also told Barbara to tell her grown daughter that he had killed Curtis, allegedly for the purpose of scaring her. Additionally, a witness described a man seen running away from the crime scene as wearing clothes similar to some later taken from appellant's home, and he also picked appellant out of a lineup as similar in appearance to the person he saw fleeing the scene. However, there was no eyewitness identification made of appellant at trial.

A bloody sock footprint was found at the crime scene which the State purported to tie to appellant through the testimony of two anthropologists as to footprint comparison and analysis. Appellant contends that the testimony of those two anthropologists should not have been permitted at trial because that testimony failed to meet the admissibility requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kelly v. State*, 824 S.W.2d 568 (Tex.Crim.App.1992). Appellant posits that the testimony was not grounded in a valid underlying scientific theory, there was no consistent technique used in applying the theory, and there was no proof that the technique was properly applied by the experts who testified at trial. He further argues that this was the only evidence to tie him to the offense and, because the State's case would have failed without it, the admission of that testimony constitutes reversible error.

■■■ Rule 702 of the Rules of Evidence provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

experience, training, or education may testify thereto in the form of an opinion or otherwise.

This rule requires scientific evidence to be reliable and relevant. *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786. To be reliable, three criteria must be met: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question. All three criteria must be proven to the trial court outside the presence of the jury before the evidence is admitted. *Kelly*, 824 S.W.2d at 573. Factors that could affect a trial court's determination of reliability include, but are not limited to, the following: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the expert testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person who applied the technique on the occasion in question. *Id.*

■■■ The burden is on the proponent of the expert testimony to prove by clear and convincing evidence that the testimony is trustworthy. *Id.* Furthermore, we review the trial court's decision under an abuse of discretion standard, which means the decision must be within the zone of reasonable disagreement in light of the evidence offered at the hearing and the requirements of Rule 702. *Id.* at 574.

■■■ The State sought to admit expert testimony to the effect that the footprint

found at the crime scene matched the footprint of appellant. Three experts testified at the hearing on the admissibility of the testimony—two on behalf of the State and one on behalf of appellant. The first witness was Dr. Harrell Gill–King, who is the director of the Laboratory of Human Identification and Forensic Anthropology at the University of North Texas. He has a doctorate in physical anthropology from the Institute for Earth and Man at Southern Methodist University, and post-doctorate training in forensic pathology and osteology from the Southwestern Institute for Forensic Sciences, as well as 19 years experience in the analysis of identification and cause of death. He testified that the human footprint leaves a unique impression when it is placed on something capable of bearing an impression, which is why footprints are placed on birth certificates. Footprint comparisons based on scientific principles, such as principles of anatomy and biomechanics, are widely recognized by other experts in forensic pathology.

As relevant to this case, Dr. Gill–King received a piece of butcher paper with a foot impression and a photograph of a material, which appeared to be concrete, with a bloody footprint on it. He concluded that they probably belonged to the same person. However, because the footprint was partial and his experience was limited to complete footprints, he referred the case to Dr. Sonek, with whom he is familiar and has heard give presentations with respect to footprint comparisons. He recognizes Dr. Sonek as an expert in this particular specialty and stated that Dr. Sonek is recognized as being credible in this particular field.

On cross-examination, Dr. Gill–King stated that once a person holds a doctorate in physical anthropology and has focused their specialization in forensic anthropology, there is no other certification available.

He also opined that he would prefer to have the original foot impression as opposed to a photograph. He is aware of the techniques and procedures to accomplish footprint analysis through his knowledge of the literature on the subject. Dr. Gill–King is only personally familiar with three or four persons who perform footprint analysis, one of whom is Dr. Sonek. He described the techniques as follows:

If we are given a complete foot impression, an unsheathed foot, no socks, no shoes, just a foot, longitudinal measurements are made. Assessment of the heights of arches are made. If dramatic lithic lines are present, they are also assessed. Photography is done.

Scaling techniques involving length to width ratios, measurements from point to point, from the ball of the foot to the outside of the foot, any anatomical uniquenesses, which are especially important, which would include defects in the bottom of the foot that might leave their own unique impressions, that is to say scars from punctures, prosthetics, any unique abnormalities, such as hammer toes, valise, valgus, other anomalies involving the foot are all noted.

He then described that he "would proceed with point by point comparisons between the two feet to determine whether, in the overall features of size, they were comparable at every step" in an attempt to rule out an individual.

Dr. Alexander Sonek testified that he is a professor of anthropology at San Diego State University and has a doctorate in anthropology from the University of Oregon. He is also a consultant in forensic anthropology for the coroner's office in Los Angeles County and San Bernadino County. Although he has never testified in court as an expert in the field of footprint comparison, he stated he is recognized as an expert in the field by his peers

and colleagues. He has participated about 20 times in police investigations involving footprint comparisons, and he has also given presentations to law enforcement agencies and professional groups.

He opined that it is possible to compare footprints from a known source to an unknown source and make an evaluation as to whether they came from the same source. He looks for a total morphological pattern, *i.e.*, not one discrete feature but a number of characteristics that together form a pattern that indicates uniqueness. He described the underlying scientific principle as each individual having a unique footprint based upon heredity and other factors that influence the configuration of the foot through life. In making his comparisons, he initially looks at the prints, lays transparent paper over the footprints, and tries to obtain outlines to superimpose upon each other to see degrees of similarities or differences and to obtain measurements. Then he tries to rule out any variation that may have been produced by the subject throwing weight to one side or the use of standing footprints and weighting footprints. He uses the shapes of the pads, the presence of the spaces between the toes, and the existence of a toe stem in his determination. Some literature on footprint comparisons was introduced into evidence, and Dr. Sonek explained some of these features with illustrations from those articles.

He received from Dr. Gill–King some photographs of footprints taken from the alleged suspect, photographs of some footprints made in blood, a sock that had been inked and used to have the suspect walk on paper, and elongated pieces of butcher paper showing forward and backward gait. Although he would prefer to have the original material in which the impression was made, in this instance he was able to work with the photographs and draw some con-

clusions. There are other experts that perform the same work he does and the idea of being able to track a person by use of a footprint has been going on for a long time.

On cross-examination, he stated that he has never been published on the topic of only footprint analysis, although he does have a publication that includes that topic. He has collected 300 footprints from 150 people which he evaluated himself; however, no one checked those results. Nevertheless, he believes his work has been "checked" when he has given presentations, especially at the American Academy of Forensic Sciences. When asked if he consults with others in his field regarding footprint analysis, he stated that he had a conversation with another man who gave a presentation on the uniqueness of footprints. He averred that there are unwritten guidelines used in the field. One guideline is that the study of footprint impressions is not equal to that of the study of dramatic lithic patterns in fingers. Another is that the techniques that apply to tire impression analysis can be applied to footprint impression evidence.

He averred that there is a protocol he uses, which includes an examination of all the materials which, in this instance, included photographs, an inked sock, and butcher paper. He agreed that having a photograph instead of the actual impression could affect clarity and most of the footprints on the butcher paper he received could not be used due to lack of clarity. It was also apparent to him that the foot impression was not the entire foot.

On re-direct, Dr. Sonek stated that there were no other footprint impression experts in Southern California that he was aware of and there is no existing association of California footprint experts. There are other experts in the United States but they are with law enforcement agencies.

There are also experts in Canada with the Royal Canadian Mounted Police. He has read articles on the subject, studied them, compared them to one another, and compared their results to his own. Part of his protocol is to make transparencies so they can be overlaid from one photograph or illustration to another. In this case, he also made some slides to assist his examination. However, he did not send his work out and have other experts look at it. His opinion was that ultimately there was a match between the footprint obtained from the crime scene and the photograph submitted to him.

Upon questioning from the court, Dr. Sonek stated that no one has published an opinion to the effect that two individuals can have the same footprint and there has been an article written indicating that twins have different footprints. A study of 50 people showed that the footprints of no two people are the same. However, that is the largest study of which Dr. Sonek has knowledge. The military has conducted studies which include closer to a million people, and yet there are no published materials that have shown occurrences of the same footprint.

Dr. Gill–King was recalled and stated that the American Academy of Forensic Sciences is a professional organization that certifies people in various aspects of forensic science. However, there is no section on footprint comparison and analysis. There is a criminalist section which consists of people specializing in DNA, fingerprints, trace evidence, hair and fiber, glass, firearms, tool marks, and voice print examiners. Although he is not a member of that section, he is unaware of any written guidelines put forth by those scientists as to the protocol for footprint analysis and he believes that if they existed, he would be aware of them. He stated that the error rate can be important in the determination of reliability, but that most error rates can be challenged. Even though something is not 100 percent accurate, it can still have value in identification. The court questioned Dr. Gill–King as to whether there was any statistical base on footprints that one could use to establish that no two people have the same footprint. He responded that there is not a huge data base, but that no one has ever shown any two footprints to be identical.

Appellant then called Sergeant Robert Ben Kennedy, a crime scene analyst with the Royal Canadian Mounted Police. He is certified in fingerprint analysis and he is also qualified as a footwear analyst. He is unaware of any certification in barefoot comparison. Sergeant Kennedy has written several articles and given 15 or 16 seminars on footprint identification. All of his papers have been peer-reviewed except one. He was involved in research where 1,000 volunteer footprints were gathered to form a data base and a comparison performed as to the uniqueness of the foot. He is currently involved in research in which 10,000 feet have been used for comparisons to try to show if a bare foot can be identified back to an individual. That research is not yet finished.

Although some protocols are written, the protocol is similar to any physical evidence obtained for comparison, and those protocols cannot always be followed. He requests a walking impression to make sure the individual is not trying to change the characteristics on his feet by walking in a manner that shows the weight-bearing area to be different. The feet are also compared to the standing impressions and to sock impressions to ensure they are consistent with all the impressions the individual makes. He requests that the original impressions be furnished to him if at all possible. He also compares the impressions to a pair of shoes that a suspect

has worn. He opined that if Dr. Sonek's report had been sent to him, he would not make a positive identification on that type of evidence because the "clarity is not to the point where I would want it."

On cross-examination, he averred that identification based on footprints is a valid science. When he does a positive match, it means that nobody else in the world could have made this impression. He has never testified to an exact match; however, he has testified to following procedures, showing the areas that compare and any dissimilarities and explaining them. He has also testified that it is highly likely that an impression was made by a certain individual and that, from his experience and work, he would not expect anybody to duplicate that impression. However, a socked foot on a cement floor does not provide the clarity where it can be said that the impression only belongs to one person. Nevertheless, some assumptions could be made with it. On redirect, he said that if Dr. Sonek concluded it was likely or probably the same person, he would have agreed, but he does not agree with a positive identification. He considers the error rate of someone doing fingerprint analysis to be the expertise of the person doing the comparisons. The same would also be true for someone conducting footprint analysis.

The court ruled that Dr. Sonek could testify "with regard to the comparison, morphology of the prints, and to point out the similarities, and if he wishes to testify that, in his opinion, they match, we will permit that, too, but I will not permit any testimony to the extent that it has to be or is uniquely the Defendant's." The court further ruled that Dr. Gill–King could testify to the matters that he testified to at the hearing and could say that the prints look alike, but that he is not an expert and would defer to an expert. He could not

opine that he concluded "beyond a reasonable doubt" the prints probably belonged to the same person.

■ All three experts were in agreement that footprint analysis is a valid science and could be used for purposes of identification. While there is no certification available in that particular science, there is literature and seminars are conducted supporting the science. All three experts described the technique used to make a comparison. While Sergeant Kennedy uses both walking and standing as well as barefoot and socked impressions to make an assessment and Dr. Sonek used only the materials provided to him, Sergeant Kennedy did not disagree with the result reached by Dr. Sonek, only the degree of certainty he would have attached to the identification. Nevertheless, because the trial court did not believe that sufficient research had been done to opine that no two individuals can ever have the same identical footprint, Dr. Sonek was not allowed to testify to such an opinion. Furthermore, Dr. Gill–King's testimony was to be qualified with a statement that he was not an expert in footprint analysis and would defer to an expert's opinion. We do not believe that the trial court abused its discretion in allowing this testimony.

■ Even if the admission of the testimony was error, it must be examined under a harmless error analysis. Rule 44.2(b) of the Texas Rules of Appellate Procedure provides: "[a]ny other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." A substantial right is affected when, after an examination of the entire record, the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State,* 953 S.W.2d 266, 271 (Tex.Crim.App.1997). Appellant argues that the only evidence tying

him to the offense was the footprint analysis. However, there was other circumstantial evidence tying appellant to the crime, such as the similarity between the knife carried by appellant and the one found at the crime scene, the threat made by appellant toward the victim, the statement by appellant to Barbara Drake that she should tell her daughter he had killed the victim, and the description of the man seen leaving the scene of the crime, including the clothes worn by that man.

Furthermore, during his testimony at trial, Dr. Sonek testified there was "very, very close similarity between the two footprints." He also averred that he would call it a match. However, he explained that he could not make that statement with the same certainty that it could be said that fingerprints matched. Appellant cross-examined Dr. Sonek with respect to his experience, training, protocol, and the clarity and sufficiency of the documents he reviewed in an attempt to impeach his opinion, thereby giving the jury possible reason to disbelieve Dr. Sonek. Appellant also called as a witness Roger A. Smith, who worked for the Southwest Institute of Forensic Sciences, and has received training in footprint analysis. He was asked by the Lubbock Police Department to compare the two footprints and concluded that the person could never be identified or eliminated from consideration as the one having made the footprint at the crime scene. Based on this testimony and the other evidence presented at trial, as well as the limitations imposed on Dr. Sonek's and Dr. Gill–King's testimony, we believe that any error was harmless.

Finding no reversible error, we overrule appellant's issue and affirm the judgment of the trial court.