681 S.E.2d 580

**The STATE, Respondent,**

v.

**Jeffrey Louis JONES, Appellant.**

**No. 26699.**

Supreme Court of South Carolina.

Heard April 7, 2009.

Decided Aug. 10, 2009.

---

Chief Appellate Defender Joseph L. Savitz, III and Deputy Chief Appellate Defender for Capital Appeals Robert M. Dudek, of South Carolina Commission on Indigent Defense, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Senior Assistant Attorney General William Edgar Salter, III, of Columbia; and Solicitor Donald V. Myers, of Lexington, for Respondent.

Justice BEATTY.

In this capital case, a jury convicted Jeffrey Louis Jones (Jones) of two counts of murder, and one count each of first-degree burglary, armed robbery, and criminal conspiracy. After the jury recommended the death penalty, the trial judge sentenced Jones to death for each murder, thirty years each on first-degree burglary and armed robbery, and a consecutive five years for criminal conspiracy.[1]

In this direct appeal, Jones alleges the trial judge erred in: (1) permitting the State to subpoena as a witness against Jones an expert the defense had engaged to advise on challenging the admissibility of the State's evidence purportedly matching Jones's footprint to the insole of a boot alleged to have left a bloody print at the crime scene; and (2) admitting "barefoot insole impression" evidence[2] that was consistent with having worn a boot linked to the murder scene because it was not scientifically reliable. This case consolidates Jones's direct appeal and the mandatory review provisions of S.C.Code Ann. § 16–3–25 (2003). Although we affirm as to the first issue, we reverse the trial judge's decision regarding the second issue. Accordingly, we reverse Jones's convictions and sentences.

## FACTS

On February 2, 1996, the victims, John Pipkin and Susan Furman, were found dead in their West Columbia home by Pipkin's stepson, John Orr. According to the autopsy, the victims were killed by blunt trauma to the head, consistent with having been beaten with a hammer and a piece of brick.

---

1. This Court reversed Jones's original convictions and sentence of death in *State v. Jones*, 343 S.C. 562, 541 S.E.2d 813 (2001) (*Jones I*).

2. In *Jones I*, this Court described this evidence as follows:

The central thesis of "barefoot insole impression" evidence is that the primary wearer of footwear, over time, begins to leave an impression of the wearer's foot in the footwear's insole. Inked impressions of the suspected wearer's feet, photos of the suspected wearer's known insoles, and a standing cast of the suspected wearer's foot are compared to the impressions in the boots, both visually and by using calipers to compare distances between toes and other features among the various exhibits.

*Jones I*, 343 S.C. at 572, 541 S.E.2d at 818.

An investigation of the crime scene revealed that approximately 700 to 1,000 dollars was taken from the home. Investigators did not find any physical evidence other than a bloody boot print at the scene.

The State's case against Jones was primarily based on the testimony of Jones's friend, roommate, and self-confessed accomplice, James Brown. According to Brown and other witnesses, Jones was angry with Pipkin, his employer at the canteen where he worked, because Pipkin had deducted an excessive amount from Jones's paycheck for snacks and drinks consumed on the job.

Brown testified that he and Jones planned the robbery of Pipkin. Brown claimed that on the way to Pipkin's residence, Jones gave him a hammer and picked up a brick. At the residence, Jones identified himself to Pipkin, who proceeded to open the door. Once inside, Jones hit Furman repeatedly in the head with the brick while Brown held her arms. According to Brown, he hit Pipkin once with the hammer and then gave the hammer to Jones who apparently bludgeoned Pipkin to death.

After Brown confessed to his participation in the crimes and implicated Jones, he led investigators to the hammer used in the murder.

At Jones's first trial, the State relied on Brown's testimony and evidence that the single, bloody boot print found at the scene was made by "steel toe" boots which allegedly belonged to Jones. In support of this theory, the State introduced testimony that the "barefoot insole impressions" left in the "steel toe" boots were consistent with the boots having been worn by Jones.

The first trial resulted in the jury convicting Jones of two counts of murder, and one count each of first-degree burglary, armed robbery, and criminal conspiracy. He received two death sentences for the murders, concurrent sentences of thirty years each on the burglary and armed robbery charges, and a concurrent five-year sentence for conspiracy.

On appeal, this Court unanimously found that four errors in the guilt phase of the trial each warranted the reversal of Jones's convictions and sentences. *State v. Jones*, 343 S.C.

562, 541 S.E.2d 813 (2001). Specifically, this Court held: (1) the defense was entitled to cross-examine Brown regarding his past dealings with the solicitor's office; (2) "barefoot insole impression" evidence was not scientifically reliable; (3) testimony that Jones was the prime suspect in the investigation was not admissible; and (4) the trial court could not change the reasonable doubt instruction after defense counsel's closing argument.

Prior to Jones's second trial, the State informed the defense that it intended to introduce "barefoot insole impression" evidence. As a result, defense counsel retained as a consultant William Bodziak, a renowned expert on this evidence. Although the defense did not intend to call Bodziak as a trial witness, the State subpoenaed him to testify at trial. The State also retained Robert Kennedy, another expert on "barefoot insole impression" evidence. Kennedy had testified for the State during Jones's first trial.

Defense counsel filed two pre-trial motions seeking to quash the subpoena of Bodziak and suppress the introduction of the "barefoot insole impression" evidence. The trial judge denied both of these motions.

Ultimately, the jury convicted Jones of two counts of murder, and one count each of first-degree burglary, armed robbery, and criminal conspiracy. Jones appeals his convictions and his sentences on two grounds.

## DISCUSSION

### I.

Jones argues the trial judge erred in compelling William Bodziak, a Florida resident who was a consultative expert for the defense on "barefoot insole impression" evidence, to testify for the State. Because the defense did not list Bodziak as a trial witness, Jones contends the State's subpoena to call him as a witness violated the work-product doctrine, the attorney-client privilege and, more importantly, Jones's Sixth Amendment right to the effective assistance of counsel. In support of this contention, Jones points out that the State had retained its own expert witness, Robert Kennedy, a leading proponent of "barefoot insole impression" evidence.

In contrast, the State claims the trial judge did not abuse her discretion in permitting Bodziak to testify for the State given: (1) Bodziak only testified during a pre-trial, *in camera* hearing; (2) Bodziak was not questioned regarding any matters protected by the attorney-client privilege or the work-product doctrine; and (3) it would be fundamentally unfair to the State for Jones to be allowed to challenge the scientific reliability of the "barefoot insole impression" evidence while simultaneously withholding non-privileged testimony from one of two internationally renowned experts whom the State initially contacted about retaining.

Prior to trial, the judge conducted an *in camera* hearing on Jones's motion to quash the State's subpoena of Bodziak. Defense counsel informed the trial judge that after this Court issued its decision in *Jones I*, the State indicated its intention to introduce "barefoot insole impression" evidence during the second trial of Jones's case. As a result, defense counsel retained Bodziak as a consultant on the evidence. Because the State declined to ship the crime scene evidence to Bodziak in Florida, defense counsel arranged for Bodziak to review the evidence at the Lexington County Sheriff's Department. Upon his arrival at the Sheriff's Department, the State served Bodziak with a subpoena to testify for the State at the trial of Jones's case.

Defense counsel told the judge that Bodziak "has educated us as to what we need to know about this field and he has helped us devise a defense strategy to contradict or rebut this evidence." In view of the defense relationship with Bodziak, defense counsel claimed the enforcement of the State's subpoena would violate the work-product doctrine, the attorney-client privilege, and Jones's Sixth Amendment right to the effective assistance of counsel. Counsel explained that the State's actions had interfered with the defense working with Bodziak, the trial strategy, and the custodial control of Bodziak. Ultimately, defense counsel claimed the defense would "lose" its expert if Bodziak was permitted to testify for the State.

In response, the State prefaced its argument with the fact that there are only "two world class experts in this area in North America, Robert Kennedy, who is retired from the

Royal Canadian Mounted Police, and Bill Bodziak who is retired from the FBI." Because Bodziak had published a book entitled *Footwear Impression Evidence*[3] after this Court's decision in *Jones I*, the State claimed it needed to call Bodziak as a witness to establish that "barefoot insole impression" evidence is now scientifically reliable. The State assured the judge that it did not intend to question Bodziak regarding any privileged communications with the defense. Instead, the State sought to elicit Bodziak's background, qualifications, experience, and his opinion regarding the validity of the science.

The State also informed the trial judge that it had contacted Bodziak via e-mail in October 2005 about potentially retaining him as an expert witness. In his response, Bodziak sent the State his curriculum vitae and a fee schedule. When the State contacted Bodziak again, he indicated that he had been retained by Jones's defense counsel.

After hearing counsel's arguments, the trial judge denied defense counsel's motion to quash the State's subpoena of Bodziak. In so ruling, the trial judge characterized the factual situation as "unique" in that it did not necessarily involve the State seeking information that was clearly privileged or fell within the work-product doctrine. The judge concluded it was necessary to hear testimony regarding the reliability of the "barefoot insole impression" science. Thus, the judge found it permissible for the State to elicit testimony from Bodziak in order to assist the trial court in its "gatekeeper function" concerning the admissibility of this evidence.

The judge, however, instructed the State not to question Bodziak regarding any communication he may have had with Jones or defense counsel. The judge further prohibited the State from inquiring about any conclusions Bodziak may have reached in analyzing the crime scene evidence.

An analysis of the trial judge's decision requires us to examine the rules and theories underlying the disclosure of evidence in criminal trials. Thus, we begin with a review of Rule 5 of the South Carolina Rules of Criminal Procedure.

---

3. William J. Bodziak, *Footwear Impression Evidence* (2d ed. 2000).

Rule 5(b)(1)(B), which governs the reciprocal disclosure of evidence by the defendant, provides:

> If the defendant requests disclosure under subdivision (a)(1)(C) or (D) of this rule, upon compliance with such request by the prosecution, the defendant, on request of the prosecution, shall permit the prosecution to inspect and copy any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with the particular case, or copies thereof, within the possession or control of the defendant, which the defendant intends to introduce as evidence in chief at the trial or which were prepared by a witness *whom the defendant intends to call at trial* when the results or reports relate to his testimony.

Rule 5(b)(1)(B), SCRCrimP (emphasis added).

Given this rule is limited to the defendant's disclosure of *tangible material* prepared by a defendant's agent, we recognize that it is not directly on point. However, we believe it provides guidance for our decision. Theoretically, this rule operates to preclude the State's subpoena of Bodziak in that a defendant's disclosure of evidence is limited to those items prepared by a witness "whom the defendant intends to call at trial." Because Jones's defense counsel did not intend to call Bodziak as a witness, the logical extension of this Rule 5 provision would not authorize the State to subpoena Bodziak, a non-testifying, consultative defense agent. *Cf. State v. Northcutt,* 372 S.C. 207, 217, 641 S.E.2d 873, 878 (2007) (applying Rule 5(b)(1)(B), SCRCrimP and holding the trial judge erred in requiring defendant to direct his expert witness to generate written reports for the benefit of the prosecution).

At least one other jurisdiction has adopted this analysis. *Commonwealth v. Kennedy,* 583 Pa. 208, 876 A.2d 939 (2005). In *Kennedy,* the Pennsylvania Supreme Court addressed the question of "whether a court can compel an expert, who was originally hired by a criminal defendant's attorney in order to prepare for the defendant's trial, to attend and testify at a defendant's trial, where the defendant does not plan on calling the expert at trial or using any materials that the expert completed as evidence at trial." *Id.* at 945.

Guided by the Pennsylvania Rules of Criminal Procedure, the court resolved the issue by extending the protections of the work-product doctrine beyond the disclosure of tangible materials. *Id.* The court recognized that the rules generally protect work product of agents hired by defense attorneys. However, the court determined that the rules did not specifically address whether the work-product doctrine bars the prosecution from calling such an agent to testify at trial. *Id.* at 947. After discussing the general principles underlying the work-product doctrine, the court concluded the same "holds true at trial regarding the disclosure of the efforts of an agent retained by a criminal defense attorney." *Id.* at 948. In reaching this conclusion, the court reasoned that to permit the prosecution to call an agent of the defense as a witness at trial would effectively "circumvent the purpose of the work-product doctrine" and that of the rules of discovery in criminal cases. *Id.* The court explained:

> While we acknowledge that the protections of the work-product doctrine traditionally have attached to the discovery of tangible materials prepared in anticipation of trial, we find that when a criminal defense counsel hires an agent in order to prepare for trial and does not plan on calling the agent as a witness at trial or to utilize materials prepared by the agent as evidence at trial, a practical application of the doctrine to trial in criminal matters bars the Commonwealth from calling such an agent as a witness on its behalf, unless the Commonwealth "first makes a showing of substantial need of that testimony and [an] inability to obtain the substantial equivalent of that testimony without undue hardship."

*Id.* at 948 (quoting *United States v. Walker,* 910 F.Supp. 861, 864 (N.D.N.Y.1995)).

We agree with the philosophical underpinnings in *Kennedy.* However, our analysis would not be complete without reviewing cases from other jurisdictions which have addressed the specific arguments raised by Jones.

Aside from the *Kennedy* court, other jurisdictions which have analyzed this issue have done so based on the following four theories: (1) the traditional work-product doctrine, (2) the attorney-client privilege, (3) the Fifth Amendment privilege

against self-incrimination, and (4) the Sixth Amendment right to the effective assistance of counsel. *People v. Spiezer*, 316 Ill.App.3d 75, 249 Ill.Dec. 192, 735 N.E.2d 1017, 1020 (2000).

■ We find the first three theories did not operate to preclude the trial judge from compelling Bodziak to testify for the State. As previously discussed, the traditional work-product doctrine generally protects defense disclosure of tangible materials prepared in anticipation of trial by a defense agent. In the instant case, the State did not attempt to discover any materials prepared by Bodziak. *See* Vitauts M. Gulbis, Annotation, *Right of Prosecution to Discovery of Case–Related Notes, Statements, and Reports—State Cases,* 23 A.L.R.4th 799 (1983 & Supp.2008) (analyzing state cases which have determined whether and under what circumstances the prosecution may be entitled to discovery of notes, statements, or reports in possession of the defense).

■ Furthermore, given the State did not attempt to elicit any confidential communications between Bodziak and the defense or any inculpatory information from Jones, we find the attorney-client privilege and Jones's Fifth Amendment right were not violated. *See Morris v. State*, 59 Md. App. 659, 477 A.2d 1206, 1210–12 (1984) (holding trial judge, under the special circumstances of the case, properly denied defendant's motion to quash prosecution's subpoena of defendant's non-testifying, consultative expert witness on the ground that information gained by objective scientific analysis conducted by experts did not violate the attorney-client privilege, the work-product doctrine, or the defendant's Fifth Amendment privilege against self-incrimination).

In view of this conclusion, we find the only conceivable basis to challenge the State's subpoena of Bodziak would be Jones's Sixth Amendment right to the effective assistance of counsel, the fourth theory. Essentially, Jones is claiming that the State's actions prevented defense counsel from effectively representing him because the subpoena of Bodziak interfered with counsel's trial preparation and strategy.

At least two jurisdictions have found, under similar circumstances to the instant case, the prosecution could not compel a defendant's non-testifying, consultative agent to testify on its behalf. *See State v. Mingo*, 77 N.J. 576, 392 A.2d 590, 592–95

(1978) (finding trial judge's decision to permit prosecutorial discovery of report of handwriting expert retained by defendant and use of expert as witness for the State improperly intruded into zone of confidentiality essential to defendant's right to effective representation of counsel but concluding error was harmless); *State v. Dunn*, 154 N.C.App. 1, 571 S.E.2d 650, 656–660 (2002) (concluding trial judge erred when it allowed the State to compel testimony of independent drug testing facility's employees who defendant did not intend to call as witnesses given this would have violated the defendant's Sixth Amendment right to the effective assistance of counsel and breached the work-product privilege).

Although we are persuaded by these decisions, we believe their holdings are not dispositive in the instant case. As recognized in *Mingo* and *Dunn*, there is undoubtedly a potential for abuse by the prosecution to compel a non-testifying, consultative defense agent to testify. If the prosecution is permitted to do this, defense counsel may be hampered in preparing a defense in that counsel may fear an unfavorable opinion by a defense agent will be utilized by the prosecution. Additionally, if the prosecution can "pilfer" the experts retained by the defense, the defense will inevitably be put at a trial disadvantage in that it will lose its expert witnesses. Furthermore, because defense counsel will be placed in the posture of cross-examining the expert witness, we believe counsel may be reticent in pursuing certain lines of questioning in the event the responses of the witness may "open the door" to privileged information.

■ In the instant case, however, we find the State did not violate any of the above-outlined theories, including Jones's Sixth Amendment right to the effective assistance of counsel. This case presents the extremely rare factual scenario where the State's actions were permissible.

Here, there were only two available expert witnesses on the "barefoot insole impression" evidence. The trial judge recognized this anomaly and properly limited the State to only eliciting non-protected information from Bodziak. *See Mingo*, 392 A.2d at 595 n. 3 ("In the rare case involving a subject as to which the number of qualified experts is few, any danger that the defense might deprive the State of expert assistance by

'scooping-up' all the available experts in the field ... can be prevented by appropriate judicial action.").

Moreover, the State only called Bodziak during an *in camera* hearing for the benefit of the trial judge's ruling on the admissibility of the "barefoot insole impression" evidence. Because Bodziak did not testify during the trial, the State's decision to call Bodziak as a witness could not have affected the jury's assessment of the evidence, *i.e.*, implicate that the defense's own expert approved of the State's assertion that this evidence was "scientifically reliable" and, thus, conclusive as to Jones's presence at the crime scene.

Additionally, the State's questioning of Bodziak was confined to general testimony regarding his expertise and his opinion regarding the scientific reliability of the evidence. Significantly, the State did not question Bodziak concerning the specifics of the crime scene evidence.

Based on the foregoing, we hold the trial judge's decision denying Jones's motion to quash the State's subpoena of Bodziak did not constitute reversible error.

We caution, however, that our decision should not be interpreted as establishing a general rule permitting the State to compel the testimony of a non-testifying, consultative defense agent. Taken to its extreme, we believe such a rule could be used by the State as a subversive tactic to circumvent discovery rules. In view of this potential for abuse, we limit this decision to the specific facts of this case and now adopt a rule which we believe will effectively balance the rights of the defendant and the interests of the State in future criminal cases.

■ If the State seeks to compel a defendant's non-testifying consultative expert to testify on its behalf, the State must prove that it has a "substantial need" for the expert and that its inability to compel the expert to testify will present "undue hardship." *See Walker*, 910 F.Supp. at 865 (concluding that *"absent a showing of substantial need and undue hardship,* the government should be precluded from eliciting testimony from the defenses' consultative experts concerning the efforts these experts undertook at the request of the defendants' attorneys, or the opinions and conclusions these experts developed at the behest of defendants' attorneys 'in the compilation

of materials in preparation for trial' " (emphasis added) (quoting *United States v. Nobles*, 422 U.S. 225, 238–39, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975))). This rule should alleviate any concern that either side could potentially "scoop up" or contract all available experts. Faced with that situation, a party could undoubtedly establish both prongs of the rule by showing that it could not present its case without the assistance of the other party's consultative expert.

## II.

In light of our decision that the State was permitted to subpoena Bodziak as a witness, the question becomes whether the trial judge erred in admitting the "barefoot insole impression" evidence during the guilt phase of Jones's trial.

In his argument, Jones primarily relies on this Court's opinion in *Jones I.* According to Jones, this Court definitively held that "barefoot insole impression" evidence is not sufficiently reliable under Rule 702 [4] of the South Carolina Rules of Evidence and this Court's decision in *State v. Council*, 335 S.C. 1, 515 S.E.2d 508 (1999).[5] Thus, Jones contends the State

---

4. Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Rule 702, SCRE.

5. In *Council*, this Court clarified the standard governing the admissibility of scientific evidence, stating:

In considering the admissibility of scientific evidence under the *Jones* standard, the Court looks at several factors, including: (1) the publications and peer review of the technique; (2) prior application of the method to the type of evidence involved in the case; (3) the quality control procedures used to ensure reliability; and (4) the consistency of the method with recognized scientific laws and procedures.

. . .

While this Court does not adopt *Daubert*, we find the proper analysis for determining admissibility of scientific evidence is now under the SCRE. When admitting scientific evidence under Rule 702, SCRE, the trial judge must find the evidence will assist the trier of fact, the expert witness is qualified, and the underlying science is reliable. The trial judge should apply the *Jones* factors to determine

was precluded from even attempting to introduce this evidence.

In the alternative, Jones argues the evidence was inadmissible given the State failed to prove any new developments which would deem it scientifically reliable during Jones's second trial. Additionally, Jones avers the prejudicial effect of this evidence outweighed any probative value pursuant to Rule 403 [6] of the South Carolina Rules of Evidence.

In contrast to Jones's interpretation of *Jones I,* the State asserts this Court's decision did not operate as a bar to the admissibility of "barefoot insole impression" evidence in Jones's second trial. Because the State offered testimony that research on this evidence had been completed and peer reviewed subsequent to *Jones I,* the State claims it is now scientifically reliable and, thus, admissible during Jones's second trial. Moreover, the State asserts the probative value of this evidence substantially outweighed any prejudicial impact.

In analyzing this issue, we must initially define our intended holding in *Jones I.* In *Jones I,* Justice Pleicones, writing for the unanimous Court, found the trial judge erred in permitting expert testimony "purporting to demonstrate that 'barefoot insole impression' testing revealed [Jones's] foot to be consistent with the impression made by the primary wearer of the 'steel toe' boot." *Jones I,* 343 S.C. at 574, 541 S.E.2d at 819. In so holding, the Court found "this 'science' unreliable" based on an application of Rule 702 and *Council.* Specifically, the Court stated:

> We find the evidence presented here insufficient to meet the *Jones'* requirements that: (1) the technique be publish-

reliability. Further, if the evidence is admissible under Rule 702, SCRE, the trial judge should determine if its probative value is outweighed by its prejudicial effect. Rule 403, SCRE. Once the evidence is admitted under these standards, the jury may give it such weight as it deems appropriate.

*Council,* 335 S.C. at 19–21, 515 S.E.2d at 517–18 (citing *State v. Jones,* 273 S.C. 723, 259 S.E.2d 120 (1979)).

6. Rule 403 provides, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403, SCRE.

ed and peer-reviewed; (2) the method has been applied to this type evidence; and (3) the method be consistent with **recognized** scientific laws and proceedings. In our opinion, it is premature to accept that there exists a science of "barefoot insole impressions."

*Jones I,* 343 S.C. at 573, 541 S.E.2d at 819 (emphasis in original). The Court further found the quality control procedures, as required by Jones, were not met to ensure the reliability of this type of testing. The Court recognized that neither SLED Agent Derrick, who performed the test, nor any other SLED agent, had ever done this type of test prior to Jones's case. Additionally, the Court noted that "Agent Derrick admittedly had not conducted the testing in conformity with SLED's quality control precautions." *Id.* at 574, 541 S.E.2d at 819. In reaching its conclusion, the Court further relied on the fact that there was no written protocol in existence when Agent Derrick conducted his testing. *Id.*

Based on our decision in *Jones I* and the lack of any subsequent research developments which would validate "barefoot insole impression" evidence, we find the trial judge erred in denying Jones's motion to suppress this evidence.

Although we stated in *Jones I* that it was "premature" to accept this type of testing, one of the bases for our rejection of this evidence was the fact that Agent Derrick failed to conduct his testing in conformity with any established written protocol. As will be more thoroughly discussed, Agent Derrick testified during Jones's second trial that he did not conduct any new or additional testing on the evidence since the first trial. Thus, the State's failure to rectify this problem prior to the second trial operated as a bar to its admission. Even if our holding in *Jones I* did not initially bar the State from introducing this evidence, we find the evolution of this evidence post-*Jones I* has not deemed it scientifically reliable.

During the *in camera* hearing, the State called William Bodziak as its first witness. Bodziak, a retired F.B.I. agent, specialized in footwear and tire impression evidence. As part of his job, Bodziak also examined "barefoot insole impression" evidence. After his retirement from the F.B.I., Bodziak continued to conduct these examinations and provided expert testimony in several cases involving this type of evidence.

Following preliminary questions regarding his background and training, the judge qualified Bodziak as an expert in "barefoot impression" evidence and, more specifically, in "barefoot insole impression" evidence.

Bodziak testified he teaches a course on footwear impression evidence and requires his students to read his book entitled *Footwear Impression Evidence,* which includes a chapter on "Impressions of the Foot." This chapter references research articles that Bodziak relied on, which included those written by Robert Kennedy, another expert retained by the State who was employed with the Royal Canadian Mounted Police. Bodziak informed the judge that both editions of this book, a 1990 edition and a 2000 edition, had been peer reviewed prior to and after publication. However, he qualified this statement by saying, "I'm not aware of anybody that's criticized what I have written in the book. Again, it's more of an informative chapter. There's really not any controversy in there for somebody to disagree with."

During his testimony, Bodziak explained the methodology for conducting an examination of suspected barefoot insole impressions where the person who wore the shoe is unknown. He admitted that this type of testing is required in only a very small percentage of shoe impression evidence. He further acknowledged that "absent [some feature] so extreme and unique," the methodology could not produce a "100 percent identification" as in DNA, fingerprint evidence, or even "outsole" evidence.

Bodziak testified that he was "comfortable with the reliability" of his results but stressed that with any forensic exam, "there [are] two important components. One of those is the science and the methodology, and the other is the examiner. And if either one of those fails, then you could have incorrect conclusions."

In terms of specific changes to the methodology since this Court's decision in *Jones I,* Bodziak testified that neither Kennedy's recent publications nor his research had "added to or modified" the methodology that Bodziak used in his examinations.

As its second witness, the State called Robert Kennedy, a forensic investigator employed with the Royal Canadian

Mounted Police between 1966 and 2006. Beginning in 1989, Kennedy conducted research involving "barefoot impression" evidence. This research involved establishing a database of barefoot impressions in order to test the hypothesis that a barefoot impression is unique to an individual. According to Kennedy, "it was readily obvious that the feet (of the one thousand volunteers) were unique enough that we could do a comparison if and when we had the opportunity from the suspect."

As a result of this research, in 1994, Kennedy began working full-time conducting footwear and barefoot impressions. He testified that he completed this research in April of 2006. During this time period, Kennedy was elected to numerous professional organizations which specialized in forensics involving footwear impressions. He also published and presented articles concerning his research, which included a 2006 article summarizing the results of his research project. According to Kennedy, this article had been accepted for "peer review publication." After his background was established, the trial judge qualified Kennedy as an expert in barefoot impression evidence and insole impression evidence.

In terms of the specific trial evidence, Kennedy concluded that "there was support to the hypothesis that Jeffrey Jones could have been the wearer of [the boot that left the bloody print at the crime scene] or somebody that would have the identical foot markings as Jeffrey Jones." Although Kennedy re-examined the evidence prior to Jones's second trial, he conceded he conducted his examination using the same methodology he used in 1998. He further admitted that since the retirement of Bodziak, the F.B.I. no longer tested footwear for "barefoot insole impression" evidence.

The defense called Dr. Donald Edwards, a professor and department chair at the University of South Carolina's Department of Statistics. During his testimony, Edwards indicated there were statistical problems with the "composition and methods of selection" that were used by Kennedy and his colleagues in conducting their research. Specifically, Edwards believed it was a "leap of faith" to apply the results of a sample taken from Carlton University students to the general population. Because the "random sample" used in the re-

search was not truly representative of the general population, Edwards believed the results of the research would not have any application to barefoot insole impression evidence. Given the study involved barefoot impressions, as opposed to barefoot insole impressions, and "the measurements were not made ... in the same fashion [as barefoot insole impressions]," Edwards concluded the findings in Kennedy's research article entitled "Large Scale Statistical Analysis of Barefoot Impressions" would be inapplicable to the situation presented in the instant case.

After hearing this testimony and the brief arguments of counsel, the trial judge stated that she wanted to hear testimony regarding the specific procedures employed by SLED Agent Derrick.

The State then called Agent Derrick as a witness. Agent Derrick testified that in 1998 he had a discussion with the State regarding Jones's case. Based on this discussion, Agent Derrick relayed to the State information regarding insole impression evidence. He learned of this information after speaking with examiners from the Royal Canadian Mounted Police. According to Derrick, he discussed Jones's case with Kennedy. Derrick testified that he collected and examined the evidence in accordance with Kennedy's instructions.

In terms of his testing procedure, Derrick admitted that the known tennis shoes of Jones that he compared with the "steel toe" boots were a size 10.5 whereas the boots were a size 9.5. He further acknowledged that he did not get exemplars from other residents of the house where the "steel toe" boots were seized despite the fact that these people had unlimited access to Jones's bedroom, a bedroom which self-confessed accomplice Brown formerly occupied, admittedly still spent a great deal of time in, and where he left another pair of boots on the day of the murders. Derrick admitted that this was the first case of its type for SLED. He also acknowledged that SLED did not a have a protocol for this type of examination at the time he conducted the test.

When asked about any additional testing since Jones's first trial, Derrick admitted that he had not conducted any additional testing. Instead, he stated that he had re-examined the evidence in order to refresh his memory prior to the second

trial. He also acknowledged that SLED no longer performs barefoot insole impression comparisons.

After Derrick's testimony, the State recalled Kennedy as a witness. Although Kennedy testified that Derrick did the testing in accordance with his instructions, Kennedy admitted that these instructions were conveyed in a half-hour telephone call.

Following Kennedy's testimony, the defense called two additional witnesses. SLED Agent Joseph Leatherman, a lieutenant with the latent print crime scene section, testified that Major Joseph Vaught, the Assistant Director of Forensics for SLED, made a written request for him to provide information regarding barefoot insole impression examinations conducted at SLED since January 24, 2001. In response to this request, Agent Leatherman sent Major Vaught a copy of a 1999 protocol developed by Lieutenant Tom Darnell and Agent Derrick. Leatherman testified that his research revealed that five cases since 1999 had used this protocol with the last case in 2001. In terms of training, Leatherman testified there was not any internal "training process for having someone trained to do this kind of comparison test" and no one at SLED was currently trained in this area.

Major Vaught, the final witness, conducted a cost/benefit analysis of performing "barefoot insole impression" evidence testing. Based on his research, Vaught concluded that if this type of testing were needed then SLED would outsource it.

In a detailed oral ruling, the trial judge denied Jones's motion to suppress the State's introduction of "barefoot insole impression" evidence. Initially, the judge recognized that this state has not adopted the standards set forth in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923) or *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Accordingly, the judge analyzed Jones's motion to suppress pursuant to Rule 702, *Council,* and *Jones.* Primarily relying on the testimony of Bodziak and Kennedy, the judge found that each of the requisite factors was met and, thus, the science of "barefoot insole impression" evidence was reliable. The judge further concluded that the probative value of the evidence outweighed any prejudicial effect. In reaching these conclusions, the judge found that

"this testimony will provide the jury with the technical analysis of barefoot insole impressions by utilizing methodology and comparisons performed on the footwear which is outside of the ambit of a layperson or lay-jurors['] common knowledge of this subject or subject matter type of analysis." The judge further stated that "the subjectivity of the analysis would go to the weight of the opinion and not its admissibility."

At trial, Agent Derrick and Kennedy essentially reiterated the testimony they gave during the *in camera* hearing.

Because our research has revealed very few cases analyzing the admissibility of this evidence, we do not believe there is a prevailing view or any particular case that provides definitive guidance on this issue.

At least three jurisdictions have admitted this evidence. *Thiel v. State*, 762 P.2d 478, 485 (Alaska Ct.App.1988) (finding Bodziak could testify as an expert in forensic foot morphology that the running shoes worn by the defendant matched the impressions left at the robbery scene based on his comparison of the insoles of the running shoes and impressions of the defendant's feet; concluding that forensic foot morphology involves "no novel scientific theory or technique" and stating "[a]lthough the comparison of insole wear patterns and foot morphology may be a relatively rare field of expertise, the underlying technique of physical comparisons is neither novel nor unaccepted"), *abrogated on other grounds by Matthew v. State*, 152 P.3d 469 (Alaska Ct.App.2007); *United States v. Ferri*, 778 F.2d 985 (3rd Cir.1985) (holding trial court did not abuse its discretion in admitting testimony from physical anthropologist that shoes found at the crime scene belonged to the defendants based on a comparison of the insoles of these shoes with the defendants' inked footprints); *cf. Hurrelbrink v. State*, 46 S.W.3d 350 (Tex.App.2001) (applying *Daubert* and finding trial court did not abuse its discretion in admitting testimony of two anthropologists as to footprint comparison and analysis of bloody sock footprint found at the crime scene to that of defendant's footprint despite Kennedy's contrary testimony for the defense); *see* James T. Watson, Annotation, *Admissibility of Expert Testimony that Item of Clothing or Footgear Belonged To, or Was Worn By, Particular Individual*, 71 A.L.R.4th 1148 (1989 & Supp.2008) (analyzing cases in

which federal and state courts have addressed the admissibility of expert testimony for the purpose of establishing that an item of clothing or footgear belonged to, or was worn by, a particular person).

Two jurisdictions have rejected this evidence in cases where Kennedy was the primary witness for the prosecution. *State v. Berry,* 143 N.C.App. 187, 546 S.E.2d 145 (2001) (discussing *Jones I* and finding it was harmless error to admit testimony regarding "barefoot insole impression" evidence; concluding "barefoot impression analysis" as presented by Kennedy was not yet a reliable science at the time of defendant's trial); *R. v. Dimitrov,* 68 O.R.3d 641 (Ontario Ct. App. 2003) (referencing *Jones I,* rejecting "barefoot insole impression" evidence presented by Kennedy, and stating "[i]n light of the significant issues as to reliability of the evidence, its lack of logical relevance and risk of distortion in the fact-finding process, the trial judge erred in principle in admitting Sergeant Kennedy's evidence").

■ Cognizant of these cases and our limited standard of review,[7] we find the evidence presented in the instant case does not satisfy the requisite reliability factors in *Jones.* As stated in *Jones I,* these reliability factors take into consideration: (1) the publications and peer reviews of the technique; (2) prior application of the method to the type of evidence involved in the case; (3) the quality control procedures used to ensure reliability; and (4) the consistency of the method with recognized scientific laws and procedures. *Jones I,* 343 S.C. at 573, 541 S.E.2d at 819.

Although the research of Kennedy and Bodziak has been presented and published, this does not satisfy the requirement of "peer review." Significantly, Bodziak's own book, *Footwear Impression Evidence,* discounts the technique. In Chapter 13, Bodziak presents an overview of the types of footwear impression evidence. In terms of "barefoot insole impression" evidence, Bodziak concludes:

There have been many previously reported "identifications" of a suspect as the wearer of a shoe. The consensus among

---

7. *See Council,* 335 S.C. at 21, 515 S.E.2d at 518 (recognizing the admission of evidence is reviewed on appeal under an abuse of discretion standard).

experienced examiners is that identifications are rare because the random individual characteristics necessary for an identification are rarely encountered. Although, in theory, random individual characteristics could exist in a foot and be transferred to the shoe or foot impression, those characteristics are normally not present nor are they retained with the detail necessary to achieve an identification.

In view of this conclusion, "experienced examiners," *i.e.*, peer reviewers, have not accepted this evidence as reliable. Furthermore, Bodziak's own testimony casts doubt on the reliability of this testing procedure wherein he stated it could not produce "100 percent identification."

In terms of prior application, the testimony revealed that Jones's case was one of the first cases where this procedure was utilized by SLED. Significantly, the procedure is no longer used by SLED or the F.B.I.

Regarding the third factor, this Court in *Jones I* found there was no established protocol or quality control procedure in place for Agent Derrick's testing of the evidence. Agent Derrick admitted that he did not conduct any additional testing prior to Jones's second trial other than to re-examine the evidence prior to his trial testimony.

As to the consistency of the methodology, Dr. Edwards, a statistician, testified that the results from the research conducted by Kennedy and his colleagues were a "leap of faith" given the random sample used for the research could not be applied to the general population. Given the study involved barefoot impressions, as opposed to barefoot insole impressions, and "the measurements were not made ... in the same fashion [as barefoot insole impressions]," Edwards concluded the findings in Kennedy's research would be inapplicable to the situation presented in the instant case.

Furthermore, we disagree with the trial judge's finding that the probative value of this evidence outweighed its prejudicial effect under a Rule 403 balancing test. Although we agree that "barefoot insole impression" evidence is outside the realm of an average juror's knowledge, the potential probative value of the evidence is clearly outweighed by the prejudicial impact. As previously discussed, we find the evidence is not scientifically reliable. In the absence of scientific reliability,

the evidence could only operate to provide inaccurate and inconclusive information for the jury.

Admittedly, this is a horrific case. However, given the fact that investigators did not find any physical evidence at the crime scene other than a bloody boot print, we cannot employ a harmless error analysis. *See State v. Reeves,* 301 S.C. 191, 194, 391 S.E.2d 241, 243 (1990) ("Error is harmless when it could not reasonably have affected the result of the trial.").

## CONCLUSION

Based on the foregoing, we affirm the trial judge's decision denying Jones's motion to quash the State's subpoena of Bodziak. Under the specific facts of this case, we conclude the State's actions did not violate the rights of Jones. However, we reverse the trial judge's decision denying Jones's motion to suppress the admission of "barefoot insole impression" evidence. Because the State did not present any evidence in Jones's second trial to establish that this procedure is now scientifically reliable, we hold the evidence should not have been admitted. Accordingly, we reverse Jones's convictions and sentences.[8]

**AFFIRMED IN PART AND REVERSED IN PART.**

WALLER, Acting Chief Justice, KITTREDGE, J., and Acting Justice JAMES E. MOORE, concur.

PLEICONES, J., concurring in a separate opinion.

Justice PLEICONES:

I agree that this case must be reversed because the trial judge erred in admitting the "barefoot insole impression evidence." In light of this reversible error, and the fact that this evidence will not be admissible at a future trial,[9] I do not join

---

8. In view of our decision to reverse Jones's convictions and sentences, we need not conduct the proportionality review as required by section 16-3-25(C) of the South Carolina Code. S.C.Code Ann. § 16-3-25(C) (2003).

9. While the possibility that the evidence would be admissible was left open in *Jones I,* that possibility is foreclosed by today's decision.

the majority's discussion of the State's right to subpoena the "expert" originally retained by the appellant.