753 S.E.2d 545

The STATE, Respondent,

v.

Steven BARNES, Appellant.

Appellate Case No. 2010–178247.

No. 27322.

Supreme Court of South Carolina.

Heard Feb. 5, 2013.

. Refiled Jan. 15, 2014.

Elizabeth Anne Franklin–Best of Blume Norris & Franklin–Best LLC, and Chief Appellate Defender Robert Michael Dudek, both of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka and Senior Assistant Attorney General Melody Jane Brown, all of Columbia, and Solicitor Donald V. Myers, of Lexington, for Respondent.

Justice PLEICONES.

Appellant was convicted of kidnapping and murdering Samuel Sturrup (victim). The jury found two aggravating circumstances, kidnapping[1] and physical torture,[2] and recommended a death sentence. The judge sentenced appellant to death for the murder, and imposed no sentence for the kidnapping. On appeal, appellant contends the trial court erred in permitting his attorney to call a defense psychiatrist to testify regarding appellant's right to represent himself and in denying his

1. S.C.Code Ann. § 16–3–20(B)(b) (Supp.2011).

2. S.C.Code Ann. § 16–3–20(B)(i) (Supp.2011).

*Faretta*[3] request, in limiting *voir dire* and in qualifying Juror # 203, and in refusing to dismiss the indictments because of the State's failure to comply with the Interstate Agreement on Detainers (IAD) Act.[4] We find the trial judge applied the incorrect competency standard in denying appellant's *Faretta* request and reverse.

## FACTS

Appellant was approximately twenty-three years old and living in Augusta, Georgia, where he surrounded himself with high school students. Two of the high school boys, Richard Cave and Antonio (Tony) Griffin testified that on Labor Day 2001, appellant called them to meet him at his "green house" in Augusta. The boys were high school seniors, who enjoyed hanging out with appellant because, as Cave testified, appellant had money, girls, and cars. When Cave and Griffin arrived, they found victim already there, along with Charlene "China" Thatcher and appellant's younger half-brother William Harris.

Appellant accused victim of stealing appellant's money, and was beating the victim with his fists, a pole, and a shock absorber. China was also accused and hit, and Griffin obeyed appellant's order to beat victim. As the night progressed, Harris left and appellant called two South Carolina brothers, the Hunsbergers, to come to the green house in Augusta. After the Hunsbergers arrived, everyone left for South Carolina. Appellant, China, Griffin, and Cave followed the Hunsbergers in appellant's car, with the victim in their car trunk, to a remote area of Edgefield County. There, appellant ordered China, Griffin, and Cave to shoot the victim, with appellant administering the *coup de grace*. Appellant told the others they were as guilty as he, and all kept quiet until parts of victim's skeleton and other identifying information were found in November 2001.

China, Griffin, and Cave, all of whom testified in the guilt phase, were serving eighteen-year sentences in Georgia for

---

3. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

4. S.C.Code Ann. §§ 17-11-10 *et seq.* (2003).

their assault of victim and faced the potential for additional charges in Georgia and South Carolina.

## ISSUE

Did the trial judge commit reversible error in denying appellant's request to waive counsel and proceed *pro se?*

## ANALYSIS

Appellant, whose competency to stand trial has never been in question, moved to be allowed to proceed *pro se* on the Friday before the trial was to commence on Monday, citing *Faretta.* Appellant was unequivocal that he was not seeking a delay or a continuance. He asked for all relevant documents to be provided for his review, and asked if he could possibly subpoena the Hunsbergers who were incarcerated in Georgia. After being placed under oath, appellant told the court he was thirty-two years old, had an 11th grade education, had been self-employed, and that he understood the charges against him and the possible sentences. He acknowledged having had an attorney in his other criminal cases, including one before this same judge.[5] Appellant acknowledged he understood he would be held to the same standards as an attorney regarding the rules of court and of evidence.

The trial judge questioned appellant under oath about a specific rule of evidence, his understanding of the prohibition of hybrid representation, his current mental health status,[6] and his familiarity with courtroom procedure and prior experience as a criminal defendant. Appellant demonstrated an understanding of the process of capital *voir dire*, stated his intention to pursue a third-party guilt defense at trial and discussed the relevant case law, the burden of proof, and his right to testify. Appellant also appeared to be familiar with

---

5. This is a reference to appellant's conviction for throwing urine on an Edgefield jailer. This Court granted certiorari to review the Court of Appeals' affirmance of appellant's conviction and reversed. *State v. Barnes*, 402 S.C. 135, 739 S.E.2d 629 (2013).

6. Appellant acknowledged having been treated for post-traumatic stress disorder after being tased by jailors. He testified that while that incident had led to counseling, and that he had suffered "mental health while [he] was younger," he was currently well.

the niceties of error preservation, for example, the need to place objections and the court's rulings on the record.

The judge then inquired into appellant's reasons for wanting to proceed *pro se*. Appellant answered that his request to proceed *pro se* was driven by trust issues, and that he had another attorney or two in mind to use as standby counsel in lieu of his appointed attorneys. As an example of the disagreement between appellant and his attorneys leading to his loss of trust in them was their decision not to subpoena the Hunsberger brothers because of counsels' belief that the brothers would invoke their Fifth Amendment right not to testify. Appellant explained that if the brothers did decline to testify, then he would use transcripts of their sworn testimony in the Georgia proceedings under Rule 804(3), SCRE. Appellant also explained his intent to refer to himself in the third person when examining witnesses. Finally, appellant explained that he lost trust in his appointed attorneys because while he had instructed them not to move for a continuance in order to preserve his IAD Act request, he had learned that they had made such requests.

The judge concluded by telling appellant, "I think you're making a mistake, but you have the right to make a mistake. I think you're making an unwise choice, but you have the right to make an unwise choice. I would advise you not to do this. . . ." The judge asked appellant to reconsider the decision and discuss it again with his appointed attorneys. Appellant agreed to do so. After a break, the judge told the attorneys to provide the discovery materials to appellant for his review over the weekend, and announced he was taking the *Faretta* motion under advisement until Monday.

On Monday, the judge qualified the *venire* and set up *voir dire* panels before taking up the *Faretta* request.

At the commencement of the hearing, one of appellant's attorneys (Tarr) referred the court to *Indiana v. Edwards*, 554 U.S. 164, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008), which holds that a state may hold a defendant who seeks to represent himself at trial to a higher competency standard than that required to stand trial. Tarr stated that "a couple of different experts that we've hired to evaluate [appellant] for purposes of the sentence phase are of the opinion that he is

very competent to stand trial, but he lacks the competency to waive his right to counsel and conduct the proceedings on his own." Tarr had Dr. Price, a psychologist previously retained by the defense as a mitigation witness, present and ready to testify regarding appellant's competency.

Appellant immediately objected to Dr. Price's testimony. First, he based his objection on the "doctor/client" relationship and the attendant privilege. He explained that he talked to Dr. Price only for penalty phase mitigation purposes, and stated, "If I'd have known that he was going to be adverse to me, I wouldn't have talked to him." Appellant then distinguished *Edwards*, pointing out that the defendant in that case was before the trial judge on his second or third competency to stand trial hearing when the waiver of counsel issue arose. Appellant continued:

> In this case here, you know, this was never an issue. I brung forth to you—I explained to you in detail when you asked me questions the last time we spoke and I brought forth everything, you know, just like you asked me to do. And the *Edwards* case is totally different from the factual situation of my case.
>
> And I object to Dr. Price getting on the stand, because, like I say, I'm not giving him no permission to say anything in regards to me, talking about me, because like I say, my attorneys, that's part of my defense, you know, when we get to the penalty phase. Once we get to that phase, then, you know, I consent for him to furnish that information to the jury for migation [sic].

The judge then asked if appellant was asking him to make a decision without adequate information. Appellant answered with a qualified yes, saying that he was entitled to due process and specifically denying his permission for Dr. Price to testify about "things that had been in [appellant's] mental records for years." He again emphasized the doctor/client relationship, and that Dr. Price represented him. Tarr stated that neither he nor Mr. Harte (the lead attorney) nor Dr. Price were "trying to be adversarial" but were instead trying to make the court aware of all the issues. Appellant again objected to any expert testimony from Dr. Price except in the penalty phase and suggested, "if you appoint a state

official to conduct that [competency to waive counsel] review, then that's a different story." The judge responded that he did not know of any procedure that would allow him to do so.[7] Attorney Harte responded that since *Edwards* failed to state the standard for competency to waive, it did not seem possible to order an evaluation. Appellant reiterated that the question was *Faretta* because his was not an *Edwards* situation as there is no indication that he, unlike the defendant Edwards, is "sick."

Following Dr. Price's testimony, the trial judge denied appellant's request to proceed *pro se* based upon a finding that appellant did not meet the heightened *Edwards* standard for competency to represent himself at trial. The judge then noted that despite appellant's responses to the *Faretta* inquiry on Friday, the judge was concerned by Dr. Price's testimony regarding appellant's competency. Ultimately he ruled:

Given the doctor's testimony and his expert opinion that the defendant has not knowingly and intelligently waived his right to counsel,[8] I find the defendant does not have a clear understanding of the dangers of self-representation in the guilt nor the sentencing phase of the trial.

I further find that the defendant does not knowingly, intelligently understand the dangers inherent in self-representation. I feel like I would not be fulfilling my responsibilities under the law to an individual that deserves a fair trial if I allow on this record, and I might add, my observations of Mr. Barnes.

Mr. Barnes has always been during these proceedings respectful to this Court and I've noted him to appear to be respectful, although not necessarily pleased at times, with his attorneys. However, he is prone to ramble. He's prone to act extra-judicious, and by that I mean not appropriate, but to act as if he were conducting his defense on the

---

7. A trial judge has the inherent authority to order an independent examination of a criminal defendant where necessary. *Cf. State v. Cooper*, 342 S.C. 389, 536 S.E.2d 870 (2000) (trial judge has inherent authority to require expert examination of defendant and order state to pay in order to maintain integrity of judicial process).

8. Note this is not the proper inquiry under *Edwards*, which does not involve the merits of the *Faretta* waiver but rather the defendant's competency to represent himself at trial.

streets, so to speak, and as we all know, the courtroom is not the place for that kind of decorum or demeanor. I think it would be abuse of my discretion to allow him to represent himself in trying to do all I can do to make sure Mr. Barnes in this very serious matter gets a fair trial. So I'm denying your motion.

And I might add, I have not seen anything but his attorneys acting in his best interest throughout the proceedings, both during the requests or expertise, motion hearings, status conferences and otherwise.

Further, I would find that it appears Dr. Price also to be acting not in Dr. Price's best interest but in Mr. Barnes' best interest.

With that being said, I will deny Mr. Barnes' motion under Faretta versus California and deny his right to self-representation and reaffirm the Court's appointment of Mr. Tarr and Mr. Harte.

The dispositive issue in this appeal is whether South Carolina will adopt the higher competency standard permitted by *Edwards* and thus alter the traditional *Faretta* threshold inquiry which permits any defendant competent to stand trial to waive his right to counsel. Since we choose not to adopt *Edwards'* higher standard for competency to represent oneself at trial, and since the trial judge's denial of appellant's request was predicated on this competency standard, we are compelled to reverse. *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (erroneous denial of *Faretta* request is a structural error requiring automatic reversal).

A South Carolina criminal defendant has the constitutional right to represent himself under both the federal and state constitutions.[9] *State v. Starnes*, 388 S.C. 590, 698 S.E.2d 604 (2010). A capital defendant, like any other criminal defendant, may waive his right to counsel. *State v. Starnes, supra; State v. Brewer*, 328 S.C. 117, 492 S.E.2d 97 (1997). So long as the defendant makes his request prior to trial, the only proper inquiry is that mandated by *Faretta*. *State v. Winkler*, 388 S.C. 574, 698 S.E.2d 596 (2010).

Recognizing that it may be to the defendant's detriment to be allowed to proceed *pro se*, his knowing, intelligent

---

9. U.S. Const. am. 6; S.C. Const. art. I, § 14.

and voluntary decision "must be honored out of that respect for the individual which is the lifeblood of the law." *Faretta*, 422 U.S. at 834, 95 S.Ct. 2525. Under *Faretta*, the trial judge has the responsibility to make sure that the defendant is informed of the dangers and disadvantages of self-representation, and that he makes a knowing and intelligent waiver of his right to counsel. *State v. Reed*, 332 S.C. 35, 41, 503 S.E.2d 747, 750 (1998).

In *Edwards*, the United States Supreme Court held that "the Constitution permits states to insist upon representation by counsel for those competent enough to stand trial under *Dusky*[10] but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Edwards*, 554 U.S. at 178, 128 S.Ct. 2379. Since the Court merely agreed that states could set a higher standard for self-representation at trial without offending the federal constitution, it declined to adopt a federal constitutional competency standard. *Id.*

■■ We decline to impose a higher competency standard upon an individual who wishes to waive his right to an attorney and represent himself at trial than that required for the waiver of other fundamental constitutional rights afforded a criminal defendant, such as the right against compulsory self-incrimination; the right to trial by jury; and the right to confront one's accusers. *See Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). A defendant who is competent to stand trial is also competent to waive these fundamental rights and plead guilty. *Sims v. State*, 313 S.C. 420, 438 S.E.2d 253 (1993). We do not find public policy supports a distinction between a defendant who wishes to plead guilty and the defendant who wishes to proceed to trial as the Sixth Amendment guarantees every criminal defendant the "right to proceed *without* counsel when he voluntarily and intelligently elects to do so." *Faretta*, 422 U.S. at 807, 95 S.Ct. 2525.[11]

---

10. *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

11. The dissent does not adopt the *Edwards* standard, which is predicated on the defendant's severe mental illness, but instead crafts a new test

The judge erred in applying the *Edwards* competency standard to appellant's request to waive his right of counsel and proceed *pro se*. Accordingly, we are constrained to reverse. *McKaskle, supra.*

## CONCLUSION

Since the *Faretta* error mandates reversal, we need not reach any of appellant's other issues save that alleging he was entitled to dismissal of all charges under the IAD Act. On the face of this record, it appears appellant waived his speedy trial rights under this Act, and we therefore decline to reverse on this ground. *See New York v. Hill,* 528 U.S. 110, 120 S.Ct. 659, 145 L.Ed.2d 560 (2000).

Appellant's convictions and sentence are

**REVERSED.**

BEATTY and HEARN, JJ., concur.

TOAL, C.J., dissenting in a separate opinion in which KITTREDGE, J., concurs.

Chief Justice TOAL.

I respectfully dissent. I would affirm Appellant's conviction and sentence.

## ISSUES PRESENTED

I. Whether the trial court erred in denying Appellant's pre-trial request to represent himself pursuant to *Faretta v. California.*

---

for capital cases only where the trial judge is to assess the defendant's "mental and psychiatric history, demeanor, and the importance of the impending trial" and weigh those findings against the defendant's request that he be allowed to waive his right to counsel. The dissent would allow the trial judge to deny a capital defendant's request to proceed *pro se* if the trial judge believes that allowing self-representation would make the proceeding less fair or the verdict not "especially reliable." The dissent's formulation of the analytical framework for deciding whether to allow a capital defendant to waive his right to counsel is not constitutionally sound, and reflects the rationale we rejected in *State v. Brewer,* 328 S.C. 117, 492 S.E.2d 97 (1997).

**II.** Whether the trial court violated Appellant's Due Process rights by relying on the pre-trial testimony of a doctor retained by Appellant's defense counsel in anticipation of exclusive use during the trial's mitigation phase.

**III.** Whether the trial court erred by limiting Appellant's trial counsel's voir dire regarding the views of potential jurors regarding the death penalty.

**IV.** Whether the trial court erred in finding Juror # 203 unqualified to sit as a juror.

**V.** Whether the trial court erred in refusing to dismiss the State's indictments against Appellant due to the State's alleged failure to comply with the Interstate Agreement on Detainers Act (IAD).

## ANALYSIS

### I. *Faretta v. California*

The majority concludes that the trial court erred in applying the *Indiana v. Edwards* competency standard to Appellant's request to waive his right to counsel and proceed pro se. I disagree.

In *Indiana v. Edwards,* the United States Supreme Court clarified the limits of a defendant's right to self-representation and made it clear that *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and its progeny, do not stand for the proposition that the right to self-representation trumps other valid constitutional considerations. 554 U.S. 164, 175, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008) ("[T]he nature of the problem before us cautions against the use of a single mental competency standard for deciding both (1) whether a defendant who is represented by counsel can proceed to trial and (2) whether a defendant who goes to trial must be permitted to represent himself."). Instead, self-representation rights must be assessed against the judiciary's responsibility to ensure the fundamental fairness and integrity of trial proceedings.

The Supreme Court's decision in *Indiana v. Edwards* explained that a defendant may be competent to stand trial, but not competent to conduct her defense at trial, and that trial

courts may investigate this variance in competency. In my view, this principle applies uniformly across the spectrum of criminal trials. The facts and circumstances of *Indiana v. Edwards* did not concern a capital proceeding but, from my perspective, these competency considerations become even more pronounced in the capital context in view of the Supreme Court's mandate that these trials include heightened reliability. *See, e.g., Woodson v. North Carolina, infra* ("Because of the qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.").

The framework and determinations examined by the majority in *Indiana v. Edwards* not only guard against compromising the rights of capital defendants whose mental competency is at issue, but protect the integrity of the judicial system as a whole. Thus, I would hold that South Carolina trial courts may "insist upon representation by counsel for those competent enough to stand trial ... but who still suffer from mental illness to the point where they are not competent to conduct trial proceedings by themselves." *See Edwards,* 554 U.S. at 177–78, 128 S.Ct. 2379.

In *Faretta,* the United States Supreme Court explained that "the Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." In that case, Anthony Faretta sought to represent himself against charges of grand theft. 422 U.S. at 807, 95 S.Ct. 2525. Questioning by the trial court revealed that Faretta had previously represented himself in a criminal prosecution, possessed a high school education, and that Faretta did not want representation from what he described as a public defender office "very loaded down with ... a heavy case load." *Id.* The trial court granted Faretta's waiver of assistance of counsel, but indicated that the court would reverse the ruling if it later appeared that Faretta could not adequately represent himself. *Id.*

Several weeks later, the trial court held a hearing and inquired into Faretta's ability to conduct his own defense, questioning Faretta specifically regarding the hearsay rule, and state law covering jury voir dire. *Id.* at 808, 95 S.Ct. 2525. The trial court ruled that based on Faretta's answers and

demeanor, he had not made an intelligent and knowing waiver of his right to assistance of counsel. *Id.* at 808–09, 95 S.Ct. 2525. The trial court also held that Faretta did not have a constitutional right to conduct his own defense. *Id.* at 809–10, 95 S.Ct. 2525. The trial court rejected Faretta's subsequent requests to represent himself, and required that only a public defender conduct Faretta's defense. *Id.* at 810–11, 95 S.Ct. 2525. The jury found Faretta guilty. *Id.* at 811, 95 S.Ct. 2525. The California Court of Appeal affirmed the trial court's ruling, and the California Supreme Court denied review. *Id.* at 811–12, 95 S.Ct. 2525. The United States Supreme Court reversed, holding:

> There can be no blinking the fact that the right of an accused to conduct his own defense seems to cut against the grain of this Court's decisions holding that the Constitution requires that no accused can be convicted and imprisoned unless he has been accorded the right to the assistance of counsel. For it is surely true that the basic thesis of those decisions is that the help of a lawyer is essential to assure the defendant a fair trial. And a strong argument can surely be made that the whole thrust of those decisions must inevitably lead to the conclusion that a State may constitutionally impose a lawyer upon even an unwilling defendant. . . . But it is one thing to hold that every defendant, rich or poor, has the right to the assistance of counsel, and quite another to say that a State may compel a defendant to accept a lawyer he does not want. The value of state-appointed counsel was not unappreciated by the Founders, yet the notion of compulsory counsel was utterly foreign to them. And whatever else may be said of those who wrote the Bill of Rights, surely there can be no doubt that they understood the inestimable worth of free choice.

*Id.* at 832–33, 95 S.Ct. 2525. The Supreme Court held that an accused who manages his own defense relinquishes many of the benefits associated with counsel, and thus, must "knowingly and intelligently" resign those benefits. *Id.* at 835, 95 S.Ct. 2525. However, the Supreme Court explained that the defendant's technical legal knowledge is not relevant to an assessment of his "knowing exercise of his right to defend himself." *Id.* at 835–36, 95 S.Ct. 2525 ("In forcing Faretta, under these circumstances to accept against his will a state-appointed

public defender, the California courts deprived him of his constitutional right to conduct his own defense.").

In *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), the Supreme Court analyzed an important limitation on a defendant's right to self-representation: the role of standby counsel. In that case, the defendant, Carl Wiggins, claimed that a pro se defendant could insist on presenting his own case completely free from any involvement by standby counsel. *Id.* at 176, 104 S.Ct. 944. Wiggins's argument relied on the *Faretta* decision's sole reference to standby counsel:

> Of course, a State may—even over objection by the accused—appoint a "standby counsel" to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary.

*Id.* (citation omitted). Wiggins argued that the "if and when" language defined the limits on standby counsel's role, and that *Faretta* did not allow standby counsel to argue with the defendant, make motions to the court contrary to the defendant's wishes, or take other steps not specifically approved by the defendant. *Id.*

The Supreme Court disagreed, and held that the *Faretta* decision did not intend for an absolute bar on standby counsel's unsolicited participation. *Id.* at 176–77, 104 S.Ct. 944 ("The right to appear pro se exists to affirm the dignity and autonomy of the accused and to allow the presentation of what may, at least occasionally, be the accused's best possible defense. Both of these objectives can be achieved without categorically silencing standby counsel."). However, the Supreme Court did set two bright line rules for the participation of standby counsel: first, the pro se defendant is entitled to preserve actual control over the case presented to the jury, and second, participation by standby counsel must not destroy the jury's perception that the defendant is representing himself. *Id.* at 178, 104 S.Ct. 944.

From my perspective, in setting a limitation on a defendant's Sixth Amendment right to self-representation, the Supreme Court recognized that this important trial right must be balanced against the overarching principles that the defen-

dant receive a fair trial, and that courts be allowed to conduct reasonable and orderly proceedings. *See McKaskle*, 465 U.S. at 183–84, 104 S.Ct. 944 ("Nor does the Constitution require judges to take over chores for a pro se defendant that would normally be attended to by trained counsel as a matter of course. *Faretta* recognized as much. The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law." (citation omitted)); *see also Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.*, 528 U.S. 152, 162, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000) ("[T]he government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting in his own lawyer.").

In addition to the self-representation overlay supplied by *Faretta, McKaskle,* and *Martinez,* the facts of the instant case must be analyzed in light of the Supreme Court's requirement that capital trials carry an element of enhanced reliability distinct from other criminal proceedings.

In *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), the United States Supreme Court explained:

> This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100–year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Id.* at 305, 96 S.Ct. 2978 (concluding that capital cases required an individualized sentencing determination encompassing the character and record of the accused); *see also Thompson v. Oklahoma,* 487 U.S. 815, 856, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) ("Among the most important and consistent themes in this Court's death penalty jurisprudence is the need for special care and deliberation in decisions that may lead to the imposition of that sanction. The Court has accordingly imposed a series of unique substantive and procedural restrictions designed to ensure that capital punishment is not

imposed without the serious and calm reflection that ought to precede any decision of such gravity and finality."); Jonathan DeSantis, *David Versus Goliath: Prohibiting Capital Defendants From Proceeding Pro Se*, 49 No. 1 Crim. Law Bulletin ART 5, at 1 (2013) ("It has long been recognized that a capital trial requires 'heightened reliability' with regards to both guilty verdicts and death sentences." (citing *Beck v. Alabama*'s[12] extension of the "heightened reliability" doctrine originally required for capital sentences to capital verdicts.)).

The heightened reliability required of capital verdicts and sentences has led states to adopt stringent requirements for attorneys representing defendants facing the ultimate punishment. For example, Florida requires attorneys serve as lead counsel in at least nine jury trials of "serious and complex cases which were tried to completion," have demonstrated "necessary proficiency and commitment which exemplify the quality of representation appropriate to capital cases," and attend a continuing legal education program, within the last two years, devoted to capital defense. Desantis, *supra*, at 3. In South Carolina, section 16–3–26 of the South Carolina Code provides that indigent defendants facing a capital trial must receive at least two court-appointed attorneys. One of the attorneys must have at least five years' experience as a licensed attorney, and at least three years in the actual trial of felony cases. S.C.Code Ann. § 16–3–26(B)(1) (2003). That section also vests this Court with the authority to "promulgate guidelines on the expertise and qualifications necessary for attorneys to be certified as competent to handle death penalty cases." *Id.* § 16–3–26(F); *see* Rule 421, SCACR ("There shall be two classes of attorneys certified to handle death penalty cases: lead counsel and second counsel.... Lead counsel shall have at least five years' experience as a licensed attorney and at least three years' experience in the actual trial of felony cases.").

Obviously, a criminal defendant who waives his right to counsel, and elects to proceed pro se, loses the benefit of counsel equipped with the type of special qualifications discussed *supra*, and this fact could make the difference in the conduct and outcome of his trial. However, this decision is

---

12. 447 U.S. 625, 638, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

constitutionally permissible provided the defendant makes a knowing and intelligent waiver of the benefit. Nevertheless, in my view, the defendant's right to self-representation is not absolute, and as discussed *supra*, courts may place reasonable restrictions on that right. For example, the Supreme Court has held that trial courts may curtail that right in the interest of providing the defendant with a fair trial, and ensuring that the proceedings do not become a mockery of the criminal justice system. *See, e.g., Martinez*, 528 U.S. at 162, 120 S.Ct. 684 (holding that states may restrict a defendant's self-representation guarantees in recognition of the government's interests in preserving the integrity and efficiency of the process).

These considerations become even more pronounced in the capital context where trials must contain an indicia of reliability higher than any other criminal trial,* and where a criminal defendant is likely at a significant disadvantage in meeting the demands of adequate representation. *See, e.g.,* Desantis, *supra*, at 4 ("Incarcerated capital defendants electing to proceed pro se also face the prospect of conducting a mitigation investigation from within the confines of prison. . . . [S]ome of the requirements for capital defense counsel detailed in the ABA Standards, such as visiting the scene of the alleged crime, are inherently unavailable to incarcerated defendants.").

In the instant case, Appellant's trial counsel began the self-representation colloquy with the trial court by explaining that different experts hired to evaluate Appellant believed he was "very competent" to stand trial, but lacked the competency to waive his right to counsel and conduct the proceedings on his own. One of these experts, Dr. David Price, testified that Appellant failed to finish high school, and has an intelligence quotient at the "very low part of the low/average range of intellectual functioning." Price also stated that Appellant had a significant psychiatric history including psychiatric disorders, admissions, post-traumatic disorder, paranoia, cognitive difficulties and lapses, and issues with judgment and decision-making. According to Price, these issues interacting with each other impaired Appellant's ability to knowingly and intelligently waive his right to counsel in this case. The trial court denied Appellant's motion to proceed pro se, holding:

Given the doctor's testimony and his expert opinion that the defendant has not knowingly and intelligently waived his right to counsel, I find the defendant does not have a clear understanding of the dangers of self-representation in the guilt nor the sentencing phase of the trial. I further find that the defendant does not knowingly, intelligently understand the dangers inherent in self-representation. I feel like I would not be fulfilling my responsibilities under the law to an individual that deserves a fair trial if I allow on this record, and I might add, my observation of [Appellant].... [Appellant] has always been during these proceedings respectful.... However, he is prone to ramble. He's prone to act extra-judicious, and by that I mean not appropriate, but to act as if he were conducting his defense on the streets, so to speak, and as we all know, the courtroom is not the place for that kind of decorum or demeanor. I think it would be an abuse of my discretion to allow him to represent himself in trying to do all I can to make sure [Appellant] in this very serious matter gets a fair trial. So I'm denying your motion.

In my opinion, the trial court did not err. The trial court's order exemplifies the balancing that must take place in a capital trial when a defendant desires to represent himself.

The majority acknowledges that in *Indiana v. Edwards,* the Supreme Court held that the United States Constitution does not forbid a state from insisting that a defendant proceed to trial with counsel if the defendant is found mentally competent to stand trial but mentally incompetent to conduct the trial herself. *Id.* at 167, 128 S.Ct. 2379. In so finding, the Supreme Court relied in part on undisputed medical opinions regarding the effects of mental illness of a defendant's ability to effectively represent herself. *Id.* at 176, 128 S.Ct. 2379 ("The American Psychiatric Association (APA) tells us (without dispute) in its *amicus* brief filed in support of neither party that '[d]isorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illnesses can impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of represented defendant.'" (citation omitted)). Additionally the Supreme Court noted the right to self-representation

will not "affirm the dignity," of a defendant without the mental capacity to conduct her defense. *Id.* ("To the contrary, given that defendant's uncertain mental state, the spectacle that could well result from his self-representation at trial is at least as likely to prove humiliating as ennobling. Moreover, insofar as a defendant's lack of capacity threatens an improper conviction or sentence, self-representation in that exceptional context undercuts the most basic of the Constitution's criminal law objectives, providing a fair trial."). Moreover, the Supreme Court observed the significant concern that "proceedings must not only be fair, they must 'appear fair to all who observe them.' " *Id.* (citing *Wheat v. United States*, 486 U.S. 153, 160, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988)); *see also Massey v. Moore*, 348 U.S. 105, 108, 75 S.Ct. 145, 99 L.Ed. 135 (1954) ("No trial can be fair that leaves the defense to a man who is insane, unaided by counsel, and who by reason of his mental condition stands helpless and alone before the court.").

Consistent with the Supreme Court's reliance on medical opinions in *Indiana v. Edwards*, the trial court in the instant case relied on expert opinions in finding that Appellant was mentally incompetent to represent himself at trial. The majority, however, chooses to ignore Dr. Price's thoughtful testimony applying Appellant's mental conditions to his ability to waive his right to counsel and represent himself at trial. Instead, the majority highlights only Appellant's familiarity with court procedure. In my opinion, the majority's analysis is insufficient to ensure the fairness mandated by the Supreme Court.

We must be mindful that state authorities charged the defendant in *Indiana v. Edwards* with attempted murder, battery with a deadly weapon, criminal recklessness, and theft. *Edwards*, 554 U.S. at 167, 128 S.Ct. 2379. These are serious crimes, but none can leave a criminal defendant susceptible to a sentence of death upon conviction. If based on these facts our nation's highest court found the curtailment of self-representation rights permissible, it is clearly constitutionally acceptable to allow South Carolina trial courts to make this determination for defendants facing the ultimate punishment. *See id.*, 554 U.S. at 177–78, 128 S.Ct. 2379 ("We consequently conclude that the Constitution permits judges to take realistic account of the particular defendant's mental capacities by

asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so.").

I strongly disagree with the majority's characterization of my analysis as a reflection of the rationale that this Court rejected in *State v. Brewer*, 328 S.C. 117, 492 S.E.2d 97 (1997). In *Brewer*, this Court reversed the denial of a defendant's motion to proceed pro se because the trial court found that the decision to waive counsel was knowing, intelligent, and voluntary and thus, the trial court violated the defendant's 6th Amendment right to self-representation by denying the motion. *Id.* at 120–21, 492 S.E.2d at 99. In *Brewer*, decided before *Indiana v. Edwards* and unlike the present case, there was no question about the defendant's mental competence. Instead, the trial court denied the motion merely because it was a death penalty case, concluding that allowing the defendant to represent himself was "fraught with inherent disastrous consequences." *Id.* at 119–20, 492 S.E.2d at 98–99.

Trial courts are in the proper position to determine a defendant's capability to adequately represent himself given their opportunity to hear testimony and review evidence about a defendant's mental competence before he may proceed pro se. A trial court is permitted to engage in an evaluation intended to balance a defendant's rights to self-representation and a fair trial, especially after *Indiana v. Edwards*. Such an evaluation eliminates unfairness on the front end of a trial and is in no way contrary to this Court's opinion in *Brewer*.

In addition, the majority is simply wrong to suggest that the foregoing reasoning ignores applicable constitutional mandates. My view of this case is firmly entrenched in precedent providing for a balancing of the constitutional right to self-representation and the heightened reliability required of capital trials. From my perspective, the aim of a comprehensive self-representation analysis is not to shield competent capital defendants from adverse outcomes, but instead to ensure that trial courts possess the authority to deal appropriately with cases where the mental competence of the defendant is at issue. *Id.* at 178–79, 128 S.Ct. 2379 ("[I]nstances in which the trial's fairness is in doubt may well be concentrated in the 20 percent or so of self-representation cases where the mental competence of the defendant is also at issue.") (citing Erica J.

Hashimoto, *Defending the Right of Self–Representation: An Empirical Look at the Pro Se Felony Defendant*, 85 N.C.L.Rev. 423 (2007)).

The importance of a "knowing, intelligent, and voluntary waiver" is without question. However, in the criminal context, it is far from the sole question. Defendants very clearly have a constitutional right to self-representation, however, this right must bow to the competing concern that "death is different," and trial courts must do everything legitimately within their power to ensure that these trials are fair and that the proceedings and verdict are especially reliable.

In the instant case, the trial court assessed Appellant's mental and psychiatric history, demeanor, and the importance of the impending trial in deciding that Appellant could not adequately represent himself. An abuse of discretion occurs when the decision is controlled by some error of law or based on findings of fact that are without evidentiary support. *See Lewis v. Lewis*, 392 S.C. 381, 390, 709 S.E.2d 650, 654–55 (2011). In my view, neither of these reversible circumstances occurred in the instant case.

## II.   Pre–Trial Testimony

Appellant asserts that the trial court violated his due process rights by relying on Price's testimony. I disagree.

As discussed, *supra*, Appellant's trial counsel indicated that experts hired to evaluate Appellant held the view that Appellant lacked the competency to waive his right to counsel and conduct the trial proceedings on his own. Appellant's trial counsel then sought to have Price testify to that view. Appellant objected, asserting that Price's testimony would violate "doctor/client" privilege and Appellant's due process rights. The trial court viewed Appellant's objection as an attempt to force the trial court to rule on Appellant's competency without having all information concerning Appellant's mental history.

In my view, Appellant did not fully disclose his mental history and other relevant information regarding his mental state during the trial court's initial inquiry into Appellant's competency to waive his right to counsel. The trial court could not make an accurate ruling on the issue of Appellant's waiver without proper access to all relevant information. Ap-

pellant misapprehends the issue as turning on his personal feelings regarding whether he was competent to conduct his own trial proceedings. Instead the issue actually centers on whether the trial court objectively viewed him competent to present a defense that comports with the reliability and integrity of a death penalty trial.

Appellant's argument relies in part on this Court's decision in *State v. Jones*, 383 S.C. 535, 681 S.E.2d 580 (2009). However, in my view, Appellant incorrectly interprets that case.

In *Jones*, the State informed the defense that it intended to introduce "barefoot insole impression" evidence. *Id.* at 540, 681 S.E.2d at 582. In response, the defense retained a renowned expert on this evidence. *Id.* The defense did not intended to call the expert at trial, but the State subpoenaed the expert to testify at trial. *Id.* The defense filed pre-trial motions seeking to quash the State's subpoena and suppress introduction of "barefoot insole impression" evidence. *Id.* The trial court denied both motions, and the jury ultimately convicted the defendant of two counts of murder. *Id.*

The defendant argued on appeal that the State's subpoena violated the work-product doctrine, attorney-client privilege, and his Sixth Amendment right to effective assistance of counsel. *Id.* at 540, 681 S.E.2d at 582–83. The State countered that the trial court did not abuse its discretion in permitting the subpoena given that expert only testified during a pre-trial, *in camera* hearing, the State did not question the expert regarding any matters produced by attorney-client privilege or work-product doctrine, and it would be fundamentally unfair to the State for the defendant to challenge the scientific reliability of "barefoot insole impression" evidence while withholding non-privileged testimony from one of the two renowned experts who the State initially attempted to retain. *Id.* at 541, 681 S.E.2d at 583.

This Court affirmed the trial court's ruling, holding:

Here, there were only two available expert witnesses on the "barefoot insole impression" evidence. The trial judge recognized this anomaly and properly limited the State to only eliciting non-protected information.... Moreover, the State only called [the expert] during an *in camera* hearing for the benefit of the trial judge's ruling on the admissibility of the

"barefoot insole impression" evidence. Because [the expert] did not testify during the trial, the State's decision to call [the expert] as a witness could not have affected the jury's assessment of the evidence.... Additionally, the State's questioning of [the expert] was confined to general testimony regarding his expertise and his opinion regarding the scientific reliability of the evidence. Significantly, the State did not question [the expert] concerning the specifics of the crime scene evidence.... Based on the foregoing, we hold the trial judge's decision denying [the defendant's] motion to quash the State's subpoena of [the expert] did not constitute reversible error.

*Id.* at 546–47, 681 S.E.2d at 586. In my opinion, the facts and circumstances of the instant case are similar. The trial court allowed the testimony of a witness, presented by the defense, for the benefit of the trial court's ruling on Appellant's competency to waive his right to counsel. This testimony took place following the Appellant's own minimization of his significant psychiatric dysfunction. However, this testimony occurred *in camera,* and the trial court did not permit the State to participate. Therefore, from my perspective, the trial court's decision to allow Price's testimony does not constitute reversible error.

However, the warning this Court issued in *Jones* applies with equal force here. In *Jones,* the Court cautioned that its decision should not be interpreted as establishing a general rule permitting the State to compel the testimony of a non-testifying, consultative defense agent. *Id.* at 547, 681 S.E.2d at 548 ("Taken to its extreme, we believe such a rule could be used by the State as a subversive tactic to circumvent discovery rules."). Thus, the Court limited the *Jones* decision to the specific facts of that case, and adopted a "substantial need" rule for instances where the State seeks to compel a defendant's non-testifying consultative expert. *Id.* In that same vein, the trial court could have ordered a separate evaluation of Appellant instead of allowing Appellant's counsel to present Price's testimony. In my view, this would have been unnecessarily duplicative given that the foundation of the trial court's decision relied on Price's analysis of Appellant's uncontroverted medical history, rather than any type of relationship between Price and Appellant. After all, Appellant's counsel

retained Price for mitigation, not for treatment.[13] Nevertheless, trial courts should avoid confusion and order a competency evaluation when necessary to provide further support for the court's ruling regarding a defendant's competency to waive his right to counsel. Moreover, attorneys, especially those providing counsel to defendants facing a capital trial, must take care to be forthright and honest with their clients concerning the use of expert witnesses.

## III. Improper Limitation of Voir Dire

Appellant argues that the trial court violated his Sixth, Eighth, and Fourteenth Amendment [14] rights by improperly limiting defense counsel's attempt to voir dire potential jurors regarding their views of the death penalty. In my opinion, this argument is without merit, and the trial court's voire dire limitations did not render Appellant's trial fundamentally unfair.

"The scope of voir dire and the manner in which it is conducted are generally left to the sound discretion of the trial court." *State v. Bixby*, 388 S.C. 528, 542, 698 S.E.2d 572, 579 (2010) (citing *State v. Stanko*, 376 S.C. 571, 575, 658 S.E.2d 94, 96 (2008)). Furthermore, "[i]t is well established that a trial court has broad discretion in conducting the *voir dire* of the jury and particularly in phrasing the questions to be asked." *Id.* (citing *United States v. Jones*, 608 F.2d 1004, 1009 (4th Cir.1979)). A limitation on juror questioning will not constitute reversible error unless the limitation renders the trial fundamentally unfair. *Id.*

### A. Procedurally Barred

Where counsel fails to exhaust all strikes, appellate review of juror qualification issues is barred. *Bixby*, 388 S.C. at 542, 698 S.E.2d at 579; *see also State v. Tucker*, 324 S.C. 155, 163, 478 S.E.2d 260, 264 (1996) (holding "[f]ailure to exhaust all of a defendant's peremptory strikes will preclude appellate review of juror qualification issues"). In the instant case, Appellant's

---

13. Contrary to Appellant's position, the trial court is not a state actor for purposes of a *Jones* analysis, and thus, application of the "substantial need" test would be nonsensical.

14. U.S. Const. amends. VI, VIII, XIV.

defense counsel used only nine of the ten available strikes during jury selection, thus in my opinion, the Court's consideration of this issue is barred. *See Bixby,* 388 S.C. at 542, 698 S.E.2d at 579 ("Because defense counsel used only seven of the ten available strikes during jury selection, review of this issue is barred.").

## B. Trial Court's Permissible Limitations

However, even if this Court's precedent did not bar review of Appellant's arguments, in my view the trial court properly limited the scope of defense counsel's examination of jurors # 146, # 157, and # 183.

### 1. Juror # 157

Appellant's trial counsel attempted to question Juror # 157 regarding "some of the factors" that the juror would consider important in making a determination of whether to impose the death penalty. The State objected, and the trial court sustained the State's objection. Appellant's trial counsel then attempted to question the juror regarding her understanding of the term murder. The trial court did not allow the question, finding the juror's opinions of "what the law of murder is" inappropriate for voir dire. Appellant's trial counsel objected to the trial court's refusal to allow him to "instruct the jurors on the definition of murder in the voir dire." The trial court overruled the objection, holding that jurors could not be questioned regarding their conceptions, or misconceptions, regarding the law, citing this Court's decision in *Bixby, supra.*

### 2. Juror # 146

During voir dire, Appellant's trial counsel and Juror # 146 engaged in the following colloquy:

Trial counsel: Now, if you were on the jury and you found that there was a murder that there was absolutely no excuse for, you could give meaningful consideration to a life sentence?

Juror # 146: Quite honestly, if there was no excuse for it, cold blooded, I couldn't. I've just got to be honest with you. If there are mitigating circumstances or situations, I mean yes, but I'd be lying if I said differently.

Under the State's cross-examination, Juror # 146 stated that he would have no predisposition on whether or not he could vote for life or death, and that if he could vote for a death sentence or life imprisonment depending on what the facts of the case warranted.

Trial counsel argued that the juror was not qualified because of his reference to murder committed in "cold blood," and requested further examination of the juror. The trial court allowed trial counsel to re-question Juror # 146. Trial counsel then asked Juror # 146, "If you found beyond a reasonable doubt that there was a murder with no excuse in cold blood, would it matter to you—would anything else matter to you?" The trial court did not allow this question, finding that it constituted an impermissible question based on a "particular hypothetical," or a "particular set of facts." Trial counsel then explained that he felt the juror had a "misconception" of murder, and that this misconception would interfere with the juror's impartiality. The trial court agreed to provide the definition of murder and explained:

> Before I go back to allowing the lawyers to ask you a few more questions, I do want to tell you that as far as murder is concerned, murder in South Carolina is the unlawful killing of a human being by another human being with malice aforethought, express or implied.

Trial counsel then questioned Juror # 146, and the juror explained that he would not make up his mind on a particular case simply because he had convicted the person of murder:

> Trial counsel: It's not an automatic decision; you're not one of those jurors that if you find a person guilty of murder, you'd automatically sentence a person to death?
>
> Juror # 146: No.
>
> Trial counsel: And if you get—in a death penalty trial an individual's found guilty of murder and you go into that penalty phase, you'd go in there with an open mind because there'd be different types of evidence in that penalty phase, evidence of aggravation, evidence of mitigation, evidence that may show something good or more of the circumstances of the nature of the crime or the particular defendant, or evidence of aggravation that may

increase the enormity of the crime, you would consider that.

Juror # 146: Yes, sir.

Trial counsel: Before you made your decision?

Juror # 146: Yes, sir. And I apologize. I assumed that's what I said.

The trial court found the juror qualified, and as Appellant concedes in his brief, trial counsel used a peremptory challenge to strike Juror # 146.

### 3. Juror # 183

Trial counsel attempted to question Juror # 183 regarding her religious and moral beliefs in relation the death penalty. Defense counsel asked Juror # 183 for her thoughts on the Biblical axiom, "eye for an eye," and whether the juror believed that the death penalty helped to "protect society." The State objected to these questions and the trial court sustained the objections.

Following the conclusion of the voir dire, the trial court excused the juror and heard the State's objection. The State argued that religion is not a proper basis for voir dire, and prospective juror should not have to explain or interpret the Bible. The State also asserted that jurors should not be questioned regarding their view of the death penalty's purposes, and this line of questioning ran afoul of the general prohibition on hypotheticals as part of voir dire. The trial court ruled that trial counsel could legitimately question the juror as to firmly held beliefs for or against the death penalty, but that it was not appropriate to investigate philosophical distinctions and differences *within* a juror's religious belief. The trial court stated explicitly that the court was not prohibiting defense counsel from questioning jurors regarding certain religious or moral beliefs. Notably, the trial court and defense counsel engaged in the following colloquy:

Trial court: I thought her responses were very clear and that she'd be a good juror when she talked about a case-by-case basis. Further, she said it would be a serious decision. *I believe you think she's qualified also you said?*

Trial counsel: Yes, your Honor.

(emphasis added).

In my view, this Court's decisions in *State v. Smart*, 278 S.C. 515, 299 S.E.2d 686 (1982), *overruled on other grounds by State v. Torrence*, 305 S.C. 45, 69 n. 5, 406 S.E.2d 315, 328 n. 5 (1991) ("To the extent they require *in favorem vitae* review, the following cases, *inter alia*, are hereby overruled."), and *State v. South*, 285 S.C. 529, 331 S.E.2d 775 (1985), *cert. denied*, 474 U.S. 888, 106 S.Ct. 209, 88 L.Ed.2d 178 (1985), provide the proper frame for viewing Appellant's arguments.

In *State v. Smart*, 278 S.C. 515, 299 S.E.2d 686 (1982), a jury found the defendant guilty of two murders while committing larceny with a deadly weapon. The defendant appealed on three separate grounds, the issue most pertinent to the instant case being his absence from the courtroom during jury selection. *Id.* at 517, 521, 299 S.E.2d at 687, 689. In *Smart*, the clerk of court conducted the initial jury selection outside the presence of the parties and the presiding judge. *Id.* at 521, 299 S.E.2d at 689–90. The parties and the trial court then examined those jurors chosen. *Id.* The defendant did not object to this procedure at trial, and this Court found that the defendant did not suffer prejudice "by his absence during the simple drawing of names." *Id.* at 521, 299 S.E.2d at 690 ("Moreover, there is no right of [a] defendant to be present when purely ministerial acts, preparatory to jury selection are performed." (alteration added)).

However, the Court found the voir dire that took place in *Smart* to be lengthy and "superfluous," providing the Court an opportunity to offer guidance regarding a capital defendant's right to examine jurors. *Id.* at 521, 299 S.E.2d at 690. The Court recognized that section 14–7–1020 of the South Carolina Code provided for a trial court's inquiry into "whether a juror is related to either party, has any interest in the cause, has expressed or formed any opinion, or is sensible of any bias or prejudice therein." *Id.* at 522, 299 S.E.2d at 690 ("The manner in which these questions are pursued and the scope of any voir dire beyond their bounds are matters of trial court discretion."). This Court observed that trial court examination prior to counsels' questioning could provide the basis for proper limitation of counsels' questions to relevant matters, holding:

The unbridled examination of jurors by counsel serves to not only unnecessarily add to the length and expense of the trial, but also serves to antagonize jurors and lessen public respect for jury duty. The extent to which voir dire examination is being permitted by trial judges causes this Court concern and, therefore, this admonition.

*Id.* at 523, 299 S.E.2d at 691.

In *South*, the defendant argued that the trial court erred in refusing to permit defense counsel to ask the jurors hypothetical questions concerning the death penalty. 285 S.C. at 534, 331 S.E.2d at 778. The Court disagreed, holding that "[c]learly, the questions would have been improper since the purpose of voir dire is to insure each juror can make a decision based on the evidence presented, rather than hypothetical evidence." *Id.; see also State v. Patterson*, 290 S.C. 523, 525–26, 351 S.E.2d 853, 854–55 (1986), *cert. dismissed*, 482 U.S. 902, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987) (relying on *South* to reject the claim that the trial court erred in refusing to allow the defendant to use hypothetical question on voire dire in an attempt to discover hidden biases or prejudices concerning the death penalty).

In my view, the United States Court of Appeals for the Fifth Circuit's decision in *King v. Lynaugh*, 850 F.2d 1055 (5th Cir.1988), *cert. denied*, 489 U.S. 1093, 109 S.Ct. 1563, 103 L.Ed.2d 930 (1989), is instructive.

In *King*, the defendant argued that the trial court violated his constitutional guarantees to a trial by a fair and impartial jury when the court refused defendant's request to question the jurors, or educate them through voir dire, concerning their knowledge of Texas parole laws. 850 F.2d at 1057. The defendant argued that if the jurors harbored misconceptions regarding Texas law, for instance regarding when a capital murder defendant might be eligible for parole, they would be biased toward imposing the death penalty. *Id.* ("On the other hand, he suggests, proper knowledge about the 20–year minimum prison term prior to parole eligibility in such cases will tend to reassure them that [the defendant] does not pose the future dangerousness to society contemplated by . . . Texas capital punishment law.").

The Fifth Circuit acknowledged that the United States Supreme Court, until that point, had only recognized racial prejudice and widespread and provocative pretrial publicity as acceptable grounds for a constitutional challenge to a trial court's voir dire procedure, and held:

> The Court has emphasized that "[t]he Constitution does not always entitle a defendant to have questions posed during voir dire specifically directed to matters that conceivably might prejudice him." *Ristaino* [*v. Ross*, 424 U.S. 589, 594, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976) ]. A graphic example of the Court's distinction appears in *Ham* [*v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973) ] where a seven-member Court majority rejected the defendant's contention that he was constitutionally entitled to inquire whether jurors were prejudiced toward people with beards.... Ham's trial and conviction occurred circa the late 1960's and early 1970's, at the apogee of student and political activism, when the wearing of a beard might well have been thought to prejudice many prospective jurors. Nevertheless, the Court refused to constitutionalize an inquiry which, in its view, would have suggested no principled limits on intrusive appellate review of voir dire. We, likewise, are unable to distinguish possible prejudice based on jurors' misconceptions about parole law from "a host of other possible similar prejudices." The views of a lay venireman about parole are no more likely to be both erroneous and prejudicial than are his views on the defendant's right not to take the stand, the law of parties, the reasonable doubt standard, or any other matter of criminal procedure. It is difficult to conceive how we could constitutionalize the inquiry concerning Texas parole while leaving these similar but also potentially influential matters to the broad discretion of the state trial court. In fact, we have previously declined to sanction constitutional challenges to the failure to conduct voir dire on the range of punishment for an offense and the meaning of certain words in the capital murder statute. Interrogating veniremen about Texas parole law raises, if anything, a more attenuated possibility of prejudice than does a question about jurors'

attitudes toward people with beards. The specific inquiry does not approach a level of constitutional sensitivity.

*Id.* at 1059.[15]

In my view, the trial court's limitations in the instant case did not violate Appellant's constitutional rights and comport with this Court's established precedent regarding voir dire's proper contours. The trial court properly restrained Appellant's defense counsel from improperly questioning potential jurors regarding their interpretation of applicable law, or hypothetical situations, and thus there is no reversible error.

## IV. Qualification of Juror # 203

Appellant argues that the trial court erred in finding Juror # 203 unqualified. I disagree.

A prospective juror may be excluded for cause when his views on capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with instructions and his oath. *State v. Sapp,* 366 S.C. 283, 290–91, 621 S.E.2d 883, 886 (2005). When reviewing the trial court's qualification of prospective jurors, the responses of the challenged juror must be examined in light of the entire voir dire. *Id.* at 291, 621 S.E.2d at 886. The determination of whether a juror is qualified to serve in a capital case is within the sole discretion of the trial judge and is not reversible on appeal unless wholly unsupported by the evidence. *Id.* A juror's disqualification will not be disturbed on appeal if there is a reasonable basis from which the trial court could have concluded that the juror would not have been able to faithfully discharge his responsibilities as a juror under the law. *Id.* at 291, 621 S.E.2d at 887.

The Record in this case demonstrates that Juror # 203 provided conflicting and inconsistent answers regarding her ability to render a death sentence in response to questioning from the trial court, defense counsel, and the State. For example, Juror # 203 initially stated that she could sentence a defendant to life imprisonment without parole or the death

---

**15.** *See State v. Matthews,* 296 S.C. 379, 384, 373 S.E.2d 587, 590 (1988) (relying on *King* in holding that the defendant was not entitled to probe potential jurors' misconceptions regarding the definition of "life imprisonment").

penalty depending on what the facts of the case "warranted." Juror # 203 appeared to confirm her view during defense counsel's initial examination. The State noted during its examination of Juror # 203 that she hesitated in answering the trial court whether she could render a death sentence. In response to the State's questions Juror # 203 stated that she was "not positively sure," she could take part in a death sentence. However, Juror # 203's answer changed during the defense's re-examination and she confirmed that she could "give meaningful consideration to a death sentence as well as a life sentence."

The trial court then re-examined Juror # 203 and the juror stated she could be fair and impartial juror and could consider life without parole or the death penalty. Nevertheless, under another re-examination by the State, Juror # 203 provided a conflicting answer:

The State: Let me ask you this: Would your feelings about signing a death verdict do you think that would interfere with your ability to sit as a juror in a death penalty case? I know you've had a lot of hesitation about whether or not you could sign your name and do that. Do you think that your feelings on that would interfere with your ability to be an effective juror in a death penalty case?

Juror # 203: I do.

The State: You think it would? I understand. Like I said, there's nothing right or wrong about it, it's just what you feel. . . .

Appellant's trial counsel attempted to clarify Juror # 203's responses and inquired,

Trial counsel: No matter how it made you feel, if you felt like the death penalty was appropriate, you could sign your name to the form, correct?

Juror # 203: Correct.

Trial counsel: Even if it made you feel a little uneasy, if that was your decision, you could sign your name?

Juror # 203: Correct.

However, the trial court interceded and questioned Juror # 203 further on her positive response to the State's question as to whether the juror's feelings would interfere with her

ability to be an effective juror. The trial court and Juror # 203 then engaged in the following exchange:

Trial court: Do you feel like because of your beliefs, because of your feelings, your hesitation given the death penalty, that your beliefs would be such that it would— your feelings would be such that it would interfere with your ability to perform your duties as a juror?

Juror # 203: Yes, sir.

Trial court: And that's because of your beliefs; is that correct?

Juror # 203: Correct.

Trial court: So you do not feel like you could adequately perform your duties as a juror because you would be hindered somewhat because of your beliefs?

Juror # 203: Yes, sir.

Trial court: And that's your beliefs that are somewhat exhibited through your hesitancy in your responses to the death penalty questions?

Juror # 203: Yes, sir.

The trial court then found Juror # 203 unqualified to serve as a juror. The trial court's reasoning bears duplication here:

I find that [Juror # 203] is not qualified. Considering the entire colloquy, even going back to my initial questioning of [Juror # 203], there was a very, very long pause when I asked her if she could return a sentence of death. Not only that, her—my observations of her demeanor, being within two feet, I guess, of her and looking down into her face, it appeared somewhat of concern to her, somewhat of a pained, emotional expression on her face. . . . Then beyond equivocation, as I recall, [the State] asked her about signing her name and then asked if she thought her feelings about the death penalty would interfere with her abilities to serve as a juror. And she said, "I do." I came back and attempted to clarify some of her responses because I think some of her responses were inconsistent between our various questioning. And she clearly stated that she felt that her feelings or her beliefs were such that it would interfere with her ability to perform her duties and follow her oath as a juror. . . . I think she did equivocate. I think her views and her responses as a whole would impair her ability to act

as an impartial juror. Therefore, considering the voir dire as a whole, I find that [Juror # 203] is not qualified.

In my view, this Court's decision in *State v. Lindsey*, 372 S.C. 185, 642 S.E.2d 557 (2007), *cert. denied*, 552 U.S. 917, 128 S.Ct. 274, 169 L.Ed.2d 200 (2007), is instructive.

In *Lindsey*, the appellant claimed the trial court erred in excusing a juror because of his views regarding the death penalty. *Id.* at 190, 642 S.E.2d at 559–60. During initial questioning, the trial court asked the juror if he could impose the death penalty, and the juror replied, "I really don't know. I really don't know if I could or not." *Id.*, 642 S.E.2d at 560. During the defense counsel's voir dire, the juror stated that he could listen to both sides and render what he felt was the appropriate penalty whether that was life imprisonment or death. *Id.* However, during the State's questioning, the juror equivocated, stating:

Most of the time I feel it is a better punishment to be in prison for life. I believe that death is not as big of a punishment as going to prison for life and having to stay in prison for the rest of your life.

*Id.* at 191, 642 S.E.2d at 560. The juror explained that his belief that life without parole was a more serious punishment than death would "most likely," but not "necessarily," lead him to choose life imprisonment over death during the trial's sentencing phase. *Id.*

The trial court ruled that the juror's belief regarding life imprisonment and the death penalty would substantially impair the juror's ability to follow the law as instructed, and noted that when asked about the death penalty the juror "took a very big deep [breath] and exhaled as if he were very uncertain as to whether or not he could do that." *Id.* at 192, 642 S.E.2d at 561 ("The [trial court] concluded 'from watching' him and considering his inconsistent responses, that [the juror] should be excused.").

This Court found the juror's ambivalent views concerning the death penalty supported the trial court's ruling, holding:

Juror K's equivocal views regarding the death penalty, his responses favoring a life sentence despite the facts of the case, and his noted hesitation when asked if he could vote for death, are a reasonable basis for the trial judge's

conclusion that Juror K's views would substantially impair his ability to act as an impartial juror. Considering the voir dire as a whole, we find the trial judge did not abuse his discretion in excusing this juror.

*Id.* at 193, 642 S.E.2d at 561; *see also State v. Green,* 301 S.C. 347, 355, 392 S.E.2d 157, 161 (1990), *cert. denied,* 498 U.S. 881, 111 S.Ct. 229, 112 L.Ed.2d 183 (1990) (holding that a trial court's disqualification of a prospective juror will not be disturbed where there is a reasonable basis from which the trial court could have concluded that the juror would not have been able to faithfully discharge his responsibilities as a juror under the law).

Accordingly, in my view, the Record demonstrates evidence supporting the trial court's disqualification of Juror # 203. Analogous to the juror in *Lindsey,* Juror # 203 provided equivocal views regarding the death penalty, and at times expressly stated that these views would prohibit the juror's ability to perform the required duties. Thus, in my opinion, the trial court did not abuse its discretion in excusing a juror that explicitly stated that the juror's views on capital punishment would prevent the performance of his duties.

## V. The Interstate Agreement on Detainers Act (IAD)

Appellant argues that the trial court erred by failing to dismiss the indictments against him because of the State's noncompliance with the Interstate Agreement on Detainers Act (the IAD). I disagree.

The IAD is a compact enabling participating states to obtain custody of prisoners incarcerated in other participating jurisdictions and bring those prisoners to trial. *Reed v. Farley,* 512 U.S. 339, 340, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994). The central purpose of the IAD is to allow participating states to uniformly and expeditiously dispose of charges pending against prisoners held out-of-state. S.C.Code Ann. § 17–11–10 (2003); *State v. Adams,* 354 S.C. 361, 370, 580 S.E.2d 785, 790 (App.2004).

The IAD's third article addresses an inmate's request for a final disposition of outstanding charges against her in another state. S.C.Code Ann. § 17–11–10, art. III. Article III provides that an inmate shall be brought to trial within one

hundred eighty days following the delivery of written notice to "the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction" of the inmate's place of his imprisonment and request for a final disposition of untried indictments or complaints. *Id.* However, the court having jurisdiction of the matter may grant any necessary or reasonable continuance provided that good cause supports the continuance. *Id.* Section 17–11–10's Article IV provides a similar method for a state to have an inmate incarcerated in another state delivered for the purposes of resolving any untried indictments or complaints. *Id.* § 17–11–10, art. IV. However, article IV's subsection (c) provides that any proceedings enacted via article IV must be commenced within one hundred twenty days of the inmates arrival in the receiving state. *Id.* Nevertheless, as in article III, the presiding court may grant any necessary or reasonable continuance supported by good cause. *Id.*

In the instant case, Appellant made an initial demand pursuant to the IAD on February 12, 2005. Prior to that request, a Georgia court convicted Appellant for kidnapping and sentenced him to life imprisonment. The solicitor informed the trial court that the instant case would proceed as a death penalty case, and, on May 27, 2005, the trial court ruled good cause had been shown as to why the case could not be handled within 180 days. The case was later scheduled for trial in 2008. However, in March 2008, Appellant's defense counsel requested a continuance because of an issue with a mitigation specialist. The Record does not explain the underlying reason for the significant delay in scheduling the instant case for trial. However, although this type of delay is unacceptable, Appellant fails to demonstrate that the delay resulted in any prejudice, and therefore, the trial court's refusal to dismiss the indictments against Appellant does not warrant reversal.

For example, in *State v. Allen*, 269 S.C. 233, 237 S.E.2d 64 (1977), the State charged the defendants with burglary. The burglary occurred on October 11, 1973, and thirteen days later, Georgia police arrested the defendants in that state on unrelated bank robbery charges. *Id.* at 236, 237 S.E.2d at 65. Subsequently, a Georgia court convicted the defendants and imposed a prison sentence. *Id.* In November 1973, South

Carolina authorities issued arrest warrants for the defendants and a South Carolina grand jury indicted the defendants in September 1975. *Id.* at 236, 237 S.E.2d at 65–66. Authorities brought the defendants to South Carolina and provided notice of the charges pending in this state. *Id.* The defendants moved for a continuance, and authorities returned the defendants to Georgia to await trial. *Id.* at 236, 237 S.E.2d at 66. Thereafter, the defendants were brought to South Carolina and tried in March 1976. *Id.* The defendants were convicted and sentenced to life imprisonment. *Id.* at 235, 237 S.E.2d at 65.

The defendants argued, *inter alia,* that their transfer to Georgia prior to trial violated the IAD's article IV(e) which provides:

> If trial is not had on any indictment, information or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment ... such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

S.C.Code Ann. § 17–11–10, art. IV(e). This Court disagreed, noting that the defendants could not demonstrate that the delay in their case resulted in any prejudice:

> Where a prisoner seeks and obtains a delay of his trial in the receiving State and is returned to the sending State to await trial, it does not mean that he waives his constitutional right to a speedy trial, but it does remove his case from the scope of the automatic dismissal provisions of the statute. In the absence of a showing of prejudice from his return to the sending State after his request for a continuance is granted, the prisoner would not be entitled to a dismissal of the charges against him, as a matter of right, under the provisions of the statute. *The record in this case fails to show any prejudice to appellants* from their return to Georgia to await trial, after the trial of the present charges was continued at their request. The trial judge, therefore, properly refused appellants' motions to dismiss the indictments in this case because of the alleged failure to grant a speedy trial.

*Allen,* 269 S.C. at 239, 237 S.E.2d at 67 (emphasis added).

I also find the United States Supreme Court's decision in *Reed v. Farley,* 512 U.S. 339, 114 S.Ct. 2291, 129 L.Ed.2d 277

(1994), instructive. In that case, the Supreme Court analyzed whether a violation of the IAD's time limitations could serve as the basis of a state prisoner's habeas corpus petition. In December 1982, Orrin Reed was confined to a federal prison in Terre Haute, Indiana, when Indiana state prosecutors charged him with theft. *Id.* at 342, 114 S.Ct. 2291. Indiana authorities lodged a detainer against Reed and took custody of him on April 27, 1983. According to the IAD, absent any continuances, Reed's trial should have commenced on or before August 25, 1983. *Id.* The trial court held two pretrial conferences, on June 27 and August 1, 1983. *Id.* At the June 27 conference, the court set a September 13, 1983 trial date, exceeding the IAD's 120–day limit. *Id.* at 343, 114 S.Ct. 2291. However, neither the prosecutor nor Reed brought this to the trial court's attention or asked for a different trial date. *Id.* At the August 1 conference, Reed explained his imminent release from federal custody and requested the trial court set bond. *Id.* The trial court set bond at $25,000 and because of a calendar conflict, reset the trial date to September 19. *Id.* Reed did not express any objection to the September 19 trial date. *Id.*

On August 29, four days prior to trial, Reed alleged that Indiana failed to try him within 120 days of his transfer and had therefore violated the IAD. *Id.* at 344, 114 S.Ct. 2291. The trial court rejected Reed's argument, explaining:

> Today is the first day I was aware that there was a 120 day limitation on the Detainer Act. The Court made its setting and while there has been a request for moving the trial forward, there has not been any speedy trial request filed, nor has there been anything in the nature of an objection to the trial setting, but only an urging that it be done within the guidelines that have been set out.

*Id.*

On the morning of the trial date, September 19, Reed filed a motion for continuance, arguing he needed additional time for trial preparation as a result of a newspaper article detailing the 1954 to 1980 timeframe of Reed's prior felony convictions. *Id.* The trial court, recognizing the possible prejudice, offered Reed three options: (1) start the trial on schedule; (2) postpone the trial for one week; or (3) continue the trial to a late

October date. *Id.* at 345, 114 S.Ct. 2291. Reed chose the third option and the trial began on October 18, 1983. The jury convicted Reed of theft, and found him to be habitual offender. *Id.* Reed received consecutive sentence of four years' imprisonment for theft and thirty years imprisonment for the habitual offender conviction. *Id.* One of Reed's primary assertions was that the IAD's time limit effectuated the Sixth Amendment's guarantee of a speedy trial right. *Id.* at 352, 114 S.Ct. 2291. Thus, according to Reed, the Supreme Court should view the alleged violation of the IAD as a "fundamental defect," entitling Reed to habeas relief. *Id.*

The Supreme Court disagreed. Much of the Supreme Court's reasoning centered on the appropriate standard for federal habeas relief, and therefore is not related to the instant case. However, in my opinion, the Court's acknowledgement that Reed suffered no prejudice is pertinent. The Court explained:

> Reed's trial commenced 54 days after the 120–day period expired. He does not suggest that his ability to present a defense was prejudiced by the delay. Nor could he plausibly make such a claim. Indeed, asserting a need for more time to prepare for a trial that would be "fair and meaningful. . . . Reed himself *requested* a delay beyond the scheduled September 19 opening. A showing of prejudice is required to establish a violation of the Sixth Amendment Speedy Trial Clause, and that necessary ingredient is entirely missing here."

*Id.* at 353, 114 S.Ct. 2291.

Appellant fails to establish any prejudice resulting from the delay in this case. The Record does not indicate that Appellant requested the trial court clarify the length of the original continuance, or that Appellant renewed his motion during the three year period following the trial court's continuance. More importantly, Appellant does not demonstrate that the delay adversely impacted his case, or that an earlier trial would have resulted in a different verdict and sentence. *Cf. id.* at 353 n. 11, 114 S.Ct. 2291 ("As the Court of Appeals noted: 'Had Indiana put Reed on trial within 120 days of his transfer from federal prison, everything would have proceeded as it did. Reed does not contend that vital evidence fell into

the prosecutor's hands (or slipped through his own fingers) between August 26 and September 19, 1983.'" (citing *Reed v. Clark*, 984 F.2d 209, 212 (7th Cir.1993))).

In my opinion, the State complied with the IAD's requirements, and the trial court's continuance satisfied the IAD's continuance provisions. Thus, I would find Appellant's argument regarding the IAD without merit.

## CONCLUSION

For the foregoing reasons, I respectfully dissent. In my opinion, this Court should affirm Appellant's conviction and sentence.

KITTREDGE, J., concurs.